*In re* RODNEY T., a Minor (The People of the State of Illinois, Petitioner-Appellee v. Rodney S., Respondent-Appellant).

First District (4th Division)    No. 1—03—2027

Opinion filed September 9, 2004.

Bruce H. Bornstein, of Chicago, for appellant.

Richard A. Devine, State's Attorney (Renee Goldfarb, Nancy Kisicki, and

Colleen M. Nevin, Assistant State's Attorneys, of counsel), and Marv Raidbard, both of Chicago, for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Rodney S. (respondent) challenges the order of the circuit court of Cook County terminating his parental rights as to Rodney T., a minor. He argues that (1) the trial court did not have jurisdiction to terminate his parental rights because he was not given notice of the prior adjudicatory hearing whereby the child was deemed neglected and declared a ward of the court; and (2) there was not clear and convincing evidence to support the court's findings that he deserted Rodney T. for the three months preceding the filing of the termination petition and that he failed to maintain a reasonable degree of interest, concern or responsibility as to his son's welfare. We affirm.

Rodney T. was born on November 1, 1987, to LaTasha T., who was then married to Gerald T. Gerald and LaTasha had other children together. The children were found home alone on September 9, 1995, and were taken into the custody of the Department of Children and Family Services (DCFS). Three days later, the State filed a petition for adjudication of wardship, naming Gerald T. as the father of all of the children, including Rodney T. On June 3, 1996, the court found that Rodney T. was neglected pursuant to section 2—3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—3(1)(b) (West 1996)), due to his exposure to an injurious environment. On September 13, 1996, the court found LaTasha and Gerald T. unfit and declared Rodney T. a ward of the court.

Rodney T. was placed in five different foster homes in the first four years following the adjudication of wardship. LaTasha was granted monthly supervised visitation for a period of time. However, after she allegedly set fire to the porch of one foster home and kidnaped the children, she was only permitted to visit with the children in the DCFS office. LaTasha died on December 27, 2000.

It is not clear at what point in time respondent began to be identified as Rodney T.'s father. The record reveals that, beginning in July 1999, the child was sometimes referred to as "Rodney [S.]" in court documents while the ChildServ case file appeared to reflect a change between September 1997 and March 1998. In any event, the record is void of any conclusive evidence of paternity or any indication that respondent ever sought to establish such at any time.

In 1999, Rodney T. was placed with his maternal aunt and has remained there since. As the State retained a goal of permanency for the child, it eventually filed its petition for appointment of a guardian with right to consent to adoption on March 5, 2002—in it, naming

respondent (and "all whom it may concern") as the child's father and requesting that he be declared unfit. The following day, the State filed an affidavit for service of publication, attesting to the fact that respondent could not be located after diligent inquiry. Respondent and "To All Whom It May Concern" were served via publication in the Chicago Sun-Times on March 11, 2002.

In April or May 2002, respondent was located in a federal prison in Greenville, Illinois. Upon learning this, the trial court appointed counsel for respondent and arranged for him to participate in the hearing on the State's petition via phone conference. Respondent filed his appearance and jury demand on July 26, 2002, and his response to the State's petition on September 12, 2002.

Trial was held on the State's petition. Caseworkers Carla Szabo and Carlissa Williams testified that diligent, yet unsuccessful, searches for respondent were conducted in April 1999, December 1999, September 2000, April or May 2001, and November or December 2001. Williams, Rodney T.'s caseworker from September 2000 through January 2003, testified that she first learned that respondent might be Rodney T.'s father when the child told her that his father's name was "Rodney S." However, Williams did not know of respondent's whereabouts until Rodney T.'s foster parents advised her that they had received a letter from respondent in August 2002. Within one week of learning of respondent's address from the child's foster parents, Williams wrote to respondent, via certified and regular mail, and informed him of the fact that Rodney T. was in DCFS custody and of his permanency plan. She also asked to be put on his visitor's list and advised him that she would be willing to transport the child for visitation. Within a day or two of sending her letter, Williams received a letter from respondent. The letter was not written in response to the one she had just sent and Williams did not know how he found out her contact information.

Williams further testified that respondent never requested a visit with the minor at any time between 1995 and January 2003. She knew of no other letters, cards, gifts, or money having been sent to the child prior to the August 2002 letter; and she knew of no visits between respondent and the child. The minor did tell her once that he had a telephone conversation with respondent years earlier.

Respondent testified that he was serving a 56-month sentence in federal prison, which began in June 2001, for conspiracy to defraud the government. His conviction, however, was for prostitution of minors and transportation of minors across state lines for purposes of prostitution. See *United States v. Spruill*, 296 F.3d 580 (7th Cir. 2002). He further testified that, prior to his incarceration, he had an ar-

rangement with LaTasha whereby she would bring Rodney T. to visit him every few months and call him monthly. He stated that he would give her money for the child when they visited. Until receiving caseworker Williams' letter, respondent did not know that Rodney T. had been taken away from LaTasha and placed in DCFS custody in September 1995. He sent Williams a letter in response, identifying himself as Rodney T.'s father, stating that he wanted his son back and wanted what was best for him, and requesting visitation. He claimed that he did not get a response and never received a service plan.

Respondent further testified that he wrote numerous letters to his son, including some during the three months prior to the filing of the State's petition. However, he also testified that he did not know where Rodney T. and LaTasha lived and he had no way of contacting them because they moved around a lot. Finally, he entered into evidence numerous prison certificates, including a GED.

On June 6, 2003, the trial court indicated that it had found, by clear and convincing evidence, that respondent had (1) deserted the minor for three months preceding commencement of termination proceedings, as set forth in section 1(D)(c) of the Adoption Act (750 ILCS 50/1(D)(c) (West 2002)); and (2) failed to maintain a reasonable degree of interest, concern or responsibility as to Rodney T.'s welfare, as set forth in section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2002)). With respect to the allegation of desertion, the court found that "[t]he unequivocal evidence was [respondent] did not have any visitation with the minor for three months before." Addressing the remaining allegation, the court stated:

"With respect to Paragraph B, I really rely on Mr. [S.'s] testimony, not the caseworker's or any of the other evidence. There's no question that Mr. [S.] has been doing work in jail to improve himself. I have his Group Exhibit No. 1 entered into evidence.

But his own testimony—and keep in mind, this case just wasn't in the system a year or two. It's been in the system a long time.

His own testimony basically was that he relied on the mother of Rodney to appear when she thought it would be proper to have him visit. He never really knew where the mother was staying, where she lived, the conditions Rodney was living in.

But he would stay in touch by the mother bringing his son to him from time to time. If it had gone on beyond three, four, five months, typically after about six months, Mr. [S.] testified he would get a little concerned and try to find the mother.

He was in Rodney's life but just by having the mother come and have Rodney visit him. He wasn't interested or concerned of Rodney's living conditions with the mother. He didn't know about those. And what's perplexing to me is he didn't know from 1995 until in August of 2002 that his son was part of the system.

\* \* \*

I'm a little confused with his testimony saying that the mother would take him over because she didn't have him since 1995 to take him over to visit.

Now, if she did take him over—she might have. It might have been not proper. But she wasn't—this child is a ward of the court. The child was not in the care of the mother to have these visitations from what I can discern from the evidence.

His testimony like at Page 68, he goes through how the system worked, that he did get money from his father, give Rodney some money at Christmas time and that. But when he was asked where was Rodney living, he says:

[']I didn't know. Like I said, I never—I didn't have no idea what places she lived in. This is what she told me. I trusted her. That was the agreement.[']

He's trusting somebody whose child since '95 is in the system.

When I questioned him—because Mr. [S.] seems genuinely concerned about Rodney but his actions don't show it when he was not incarcerated. At Page 73, I ask:

[']Do you understand that custody of the children—of Rodney was taken away from Ms. [T.] in September 1995?[']

He said:

[']No, I didn't know that, Judge.[']

Now, how often would she bring Rodney to visit you during this period of time?

[']It would vary, three months I would say I would hear from her. If six months past [sic], I would know something is wrong, five, six months at the latest. So she might like in one year bring Rodney two or three times.[']

I think if you look at everything going on here, if he truly was interested or concerned about Rodney, he would have known where the mother was living. He would have sought out and found the child was in the system and done something to bring him home to him.

Again, mother died in December. And Mr. [S.] testified that she was the only vehicle he had to visit the minor. And he was incarcerated in June.

So just the evidence shows there's no way he could have visited for those six months with Rodney because the mother was dead. He said the only time he had visits—and I think this is what the record shows. The only time he had visits was when mother would bring Rodney to him. So there's a six-month period where there's a void.

I believe if you take all the evidence and rely specifically on Mr. [S.'s] own testimony, under the law—and I don't expect him to

know the law, but I have to use his actions to make a finding—I do find the State has proved by clear and convincing evidence that Mr. [S.] has failed to maintain a reasonable degree of interest, concern, or responsibility as to Rodney's welfare."

Subsequently, at the best interest hearing on June 23, 2003, the court determined that it was in Rodney T.'s best interests to terminate respondent's parental rights and allow the child to be adopted. On July 7, 2003, respondent filed a notice of appeal from the order terminating his rights.

On appeal, respondent challenges the trial court's jurisdiction to terminate his parental rights because he was not given notice of the prior adjudicatory hearing whereby the child was deemed neglected and declared a ward of the court. In addition, respondent argues that there was not clear and convincing evidence to support the court's findings that he deserted Rodney T. for the three months preceding the filing of the termination petition and that he failed to maintain a reasonable degree of interest, concern or responsibility as to his son's welfare.

We address respondent's jurisdictional challenge first. He alleges that, because he was not named as a party in the underlying adjudication, disposition, and permanency hearings regarding Rodney T., and was not given notice of those proceedings, the trial court was without jurisdiction to terminate his parental rights. The State responds that respondent was not a "necessary party" to the underlying suit within the meaning of the Juvenile Court Act of 1987 (705 ILCS 405/1 *et seq.* (West 2002)) and, thus, was not entitled to notice. Because the question before us—whether respondent was a necessary party to juvenile court proceedings for the adjudication of wardship—is one of statutory construction, we review it *de novo*. See *In re K.C.*, 323 Ill. App. 3d 839, 847 (2001).

■ The failure to name and serve a necessary party in a juvenile proceeding raises the question, not of personal jurisdiction over that party, but of the subject matter jurisdiction of the court. *In re Miracle C.*, 344 Ill. App. 3d 1046, 1054 (2003), citing *K.C.*, 323 Ill. App. 3d at 846. Under the Juvenile Court Act, the parties with rights in juvenile proceedings include "the minor who is the subject of the proceeding and his parents, guardian, legal custodian or responsible relative who are parties respondent." 705 ILCS 405/1—5(1) (West 2002). The Juvenile Court Act further provides that the term "parent" means: the father or mother of a child, including any adoptive parent; or a man whose paternity is presumed or has been established under the law of this or another jurisdiction; or a man who has registered with the Putative Father Registry and whose paternity has not been ruled

out under the law of this or another jurisdiction. 705 ILCS 405/1—3(11) (West 2002).

■ Respondent asks that we consider *In re Miracle C.*, 344 Ill. App. 3d 1046 (2003), in support of his argument that the court was without jurisdiction to terminate his parental rights. In *Miracle C.*, the appellate court found that an order terminating the respondent's rights was void for lack of jurisdiction because the respondent, a named party, had not been given notice prior to the adjudicatory phase of the proceedings and, as a result, he was denied his due process rights in the proceedings terminating his parental rights. *Miracle C.*, 344 Ill. App. 3d 1046. We find *Miracle C.* inapposite, however, in that it involved a default order entered against a man who was both identified as the father and named as party to the suit. *Miracle C.*, 344 Ill. App. 3d at 1048. In the instant case, respondent did not fall within any of the categories of "parent," as defined by the Juvenile Court Act, at the time of the adjudication proceedings. Namely, he was not the presumed father, his paternity had never been established, and he had not registered with the Putative Father Registry. See 705 ILCS 405/1—3(11) (West 2002). We therefore find that he was not entitled to notice under the statute, and we reject his jurisdictional challenge on this basis.

We further note that even if respondent had been identified as the child's father and, thus, a "necessary party" to the underlying proceedings, notice to him would have been excused because his whereabouts were unknown. See *In re C.R.H.*, 163 Ill. 2d 263, 269-71 (1994) (even though a parent generally has a constitutional right of due process to receive adequate notice of a juvenile proceeding, notice to a noncustodial parent whose whereabouts are unknown is excused if the custodial parent received notice); see also *Miracle C.*, 344 Ill. App. 3d at 1054 (recognizing this exception, though finding it inapplicable under the circumstances).

Having found that the court had jurisdiction over this matter, we next consider respondent's arguments regarding the sufficiency of the evidence. Under the Juvenile Court Act and the Adoption Act, the involuntary termination of parental rights involves a two-step process whereby the State must first show by clear and convincing evidence that the parent is unfit under any one ground provided in the Adoption Act (750 ILCS 50/1(D) (West 2002)) before the court considers whether termination is in the best interests of the child. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). The trial court found that the State had met its burden with regard to section 1(D)(b) (750 ILCS 50/1(D)(b) (West 2002)), finding that respondent had failed to maintain a reasonable degree of interest, concern or responsibility, and section 1(D)(c)

(750 ILCS 50/1(D)(c) (West 2002)), finding that he had deserted the child; accordingly, the court declared respondent unfit. Respondent argues that the trial court erred in making this determination.

When the trial court's determination at the fitness stage of the termination proceedings is challenged for the sufficiency of the evidence, the appropriate method of review is the manifest weight standard. *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002). A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite conclusion. *D.M.*, 336 Ill. App. 3d at 773. Because the reviewing court does not reweigh the evidence or reassess the credibility of the witnesses, we will defer to the trial court's finding. See *D.M.*, 336 Ill. App. 3d at 773.

■ The record reveals that the court based its finding that respondent had failed to maintain a reasonable degree of interest, concern or responsibility exclusively on his testimony, in which he stated that he had waited for LaTasha to initiate visits with the child; that he did not know where the child was living; that he did not know that the child was part of the DCFS system until August 2002; and that there was a six-month period after LaTasha died, and before he was incarcerated, in which he could not have had any contact with the child. The court further noted that respondent's testimony that he had visited with the child consistently through the mother conflicted with other evidence regarding her highly restricted access to the children. In addition, we note that respondent never requested a visit with the child, nor did he even contact DCFS until several months after the State had begun termination proceedings against him.

Deferring to the trial court's findings, we find the evidence in the record sufficient to support the trial court's finding that respondent was unfit on the ground that he failed to maintain a reasonable degree of interest, concern or responsibility toward the child's welfare. Having determined that the evidence was sufficient to order termination on this basis, we need not address respondent's argument regarding the court's finding of desertion.

Affirmed.

QUINN, P.J., and THEIS, J., concur.