Docket No. 108487.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

*In re* ESTATE OF MARY ANN WILSON (Arnetta Williams, Appellant, v. Karen A. Bailey, Appellee).

*Opinion filed October 21, 2010.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Thomas, Kilbride, and Garman concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion, joined by Justice Burke.

Chief Justice Fitzgerald took no part in the decision.

## OPINION

The issue in this case is whether a circuit judge who is the subject of a petition for substitution for cause under section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)) must refer the petition to another judge for a hearing automatically, upon the filing of the petition, even when the petition, on its face, fails to comply with threshold procedural and substantive requirements. In the matter before us, the circuit judge did not believe that automatic referral was necessary in such circumstances and denied the motion for substitution. The appellate court reversed and remanded in a

published opinion (389 Ill. App. 3d 771), expressly rejecting precedent from other districts which held that the circuit court may evaluate the sufficiency of a petition for substitution before referring it to another judge for a hearing on whether cause for substitution exists. See *In re Estate of Hoellen*, 367 Ill. App. 3d 240 (2006); *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d 644 (1997). One justice dissented, arguing that where a petition is insufficient on its face, the statute does not require that it be automatically referred to another judge for a hearing. We granted leave to appeal. 210 Ill. 2d R. 315. For the reasons that follow, we reverse the appellate court's judgment and affirm the judgment of the circuit court.

## BACKGROUND

The events giving rise to this appeal began in May of 2006, when Isaac Heard, Sr., brother of Mary Ann Wilson (Mrs. Wilson), filed a petition in the circuit court of Cook County pursuant to sections 11a–3 and 11a–8 of the Probate Act of 1975 (755 ILCS 5/11a–3, 11a–8 (West 2006)) alleging that Mrs. Wilson was a disabled person and requesting that Arnetta Williams, one of Mrs. Wilson's cousins, be appointed guardian of her estate and person.[1] At the time Heard filed his petition, Wilson was 86 years of age. She is now 90.

Heard's decision to initiate the guardianship proceedings was the culmination of a series of events dating back to 2003, when social service agencies began receiving requests to assist Mrs. Wilson with various problems she was having, including the lack of heat in her home and the need for assistance with bill paying, medication, meals and home care. In early 2006, the City of Chicago Department on Aging began sending a public health nurse to Mrs. Wilson's home after receiving a report that money was being taken from her. The nurse, named Sherry Ponce De Leon, first visited the premises on January 4, 2006. She performed a "well-being" check on Mrs. Wilson and Wilson's elderly companion, a man named Clifford Service. Based on her observations, nurse Ponce De Leon recommended that the

---

[1]Heard resided in North Carolina. Williams subsequently replaced him as petitioner. See *In re Estate of Williams* (*Williams I*), 373 Ill. App. 3d 1066, 1067 n.1 (2007).

-2-

couple undergo competency evaluations by a doctor specializing in gerontology.

Over the next four months, the Department on Aging received more than 20 additional calls and reports concerning the welfare of Mrs. Wilson and Mr. Service. Arnetta Williams, Mrs. Wilson's cousin, visited Wilson's home on April 15, 2006, and found that she had been abandoned, left in feces, unable to walk or talk, and in a state of starvation. Williams relayed her discovery to Mr. Heard, Mrs. Wilson's brother, so that he would be aware of the situation.

On May 3, 2006, the Department on Aging and Williams both contacted nurse Ponce De Leon with a report that Mrs. Wilson and Mr. Service were locked in Wilson's house. When Ponce De Leon reached the house, she was met by Williams, two uniformed police officers, and a certified nursing assistant from the United States Department of Veterans' Affairs (the VA). The nursing assistant reported that neither Wilson nor Service had their medication. While nurse Ponce De Leon noticed that there was food in the house, she observed that both Wilson and Service appeared frail and confused and were not oriented to date and place. The two complained that they had not received medical care and that someone was taking their pension checks.

Mr. Service was able to leave the house on his own. Mrs. Wilson required assistance from nurse Ponce De Leon, the VA nursing assistant, and one of the police officers. Nurse Ponce De Leon drove the two to the Saints Mary and Elizabeth Medical Center in the City of Chicago, where they were examined.[2] A physician advised nurse Ponce De Leon that Mrs. Wilson had a heart murmur and was dehydrated. Mr. Service was also dehydrated. Both received fluids intravenously and both were eventually admitted to the hospital. Mrs. Wilson was diagnosed with failure to thrive, aphasia (the inability to communicate through speech), organic brain syndrome and abandonment. She remained at the hospital for a month.

Five days after Wilson and Service were hospitalized, Mr.

---

[2]This facility has two campuses. There is some discrepancy in the record as to which of the two facilities initially treated Wilson and Service. That question, however, is not material to the litigation.

Service's son, David, petitioned the court to adjudge Mrs. Wilson a disabled person and to appoint him as her plenary guardian. That petition, which was later dismissed, was followed by the guardianship petition filed by Mrs. Wilson's brother, Mr. Heard. As noted previously, it was Heard's petition which gave rise the proceedings currently before us.

Upon the filing of Mr. Heard's petition, the circuit court appointed Sandra Thiel to serve as Mrs. Wilson's guardian *ad litem*. The court's order directed the guardian *ad litem* to interview Wilson, advise her of her rights under section 11a–11 of the Probate Act (755 ILCS 5/11a–11 (West 2006)), and to attempt to ascertain Wilson's views regarding the adjudication of disability, the proposed guardian, and various other matters relevant to the guardianship.

The guardian *ad litem* reported to the court the circumstances of Mrs. Wilson's admission to the hospital. She also related her impressions of Mrs. Wilson based on a personal interview. She described Mrs. Wilson this way:

> "very frail, thin and weak. She did not know where she was, her address, if she ever had any children, why she was in hospital, how she got there, her age, date of birth, or what medication she was taking."

The guardian *ad litem* reported that a psychological evaluation had described Mrs. Wilson as

> "oriented only to name, cannot give her medical history, her face is expressionless, concentration impaired; impression: organic brain syndrome with agitation."

According to the guardian *ad litem*, Mrs. Wilson was also diagnosed by a specialist with a probable urinary tract infection. The hospital physician treating her opined that she required 24-hour nursing care.

In the course of her investigation, the guardian *ad litem* discovered that Mrs. Wilson had apparently signed powers of attorney for both health care and finance prior to her hospitalization. The documents designated a woman named Karen Bailey as Mrs. Wilson's agent. Bailey's relationship to Mrs. Wilson was initially unknown, and the guardian *ad litem* recommended that the powers of attorney be temporarily suspended.

Following receipt of the guardian *ad litem's* report, the circuit

court conducted a hearing on May 15, 2006, at which the guardian *ad litem* and Arnetta Williams each appeared. At the conclusion of the hearing, the court entered an order appointing Arnetta Wilson temporary guardian of Mrs. Wilson's estate and person to pursuant to section 11a–4 of the Probate Act (755 ILCS 5/11a–4 (West 2006)), and granting her authority to arrange for Mrs. Wilson's medical care and placement in a nursing home, to investigate Wilson's financial circumstances and mail, to investigate the powers of attorney discovered by the guardian *ad litem*, and to obtain access to Wilson's medical records. The court also suspended, until further order, the powers of attorney naming Bailey as Mrs. Wilson's agent and authorized Williams to collect from Karen A. Bailey a signature stamp bearing Mrs. Wilson's name.

The record shows that at the time of these events, Karen Bailey was employed as executive secretary for a member of the Cook County board of commissioners. Bailey claimed that the health care and finance powers of attorney naming her as Mrs. Wilson's agent were executed by Mrs. Wilson in Bailey's employer's office on January 16, 2004. The record also contains a will, purportedly executed by Mrs. Wilson on the same date, which named Bailey as the executor of Wilson's estate and left to Bailey Wilson's entire estate.

It was eventually discovered that the dates on the documents were fraudulent. Email records obtained by subpoena and admitted into evidence established that the power of attorney and will forms were actually purchased by Bailey, online, from a company called Legacy Writer, Inc., in 2006. Bailey bought and downloaded the forms no earlier than February 6, 2006, more than two years after Bailey claims Wilson signed them. It appears from the record that they may not actually have been obtained by her until April 20, 2006, just weeks before these proceedings commenced.

Bailey's misconduct was brought to the attention of prosecutors, who initiated criminal proceedings against her. As a result of her wrongdoing with respect to Mrs. Wilson and Mrs. Wilson's finances, Bailey was ultimately convicted of multiple felony counts of theft (720 ILCS 5/16–1(a) (West 2006)) and financial exploitation of an elderly person (720 ILCS 5/16–1.3(a) (West 2006)). Bailey was sentenced to 11-year sentences on each of six counts (the court vacated judgment on two additional counts), the sentences to run concurrently. She is

currently incarcerated at the Illinois Department of Corrections' Decatur Correctional Center.[3]

Shortly after the court entered its rulings on May 15, 2006, Bailey retained counsel, who filed a combined "emergency motion to vacate order of temporary guardian for disabled person and estate" and motion for "injunctive relief and accounting." The motion asserted, *inter alia*, that complaints regarding Bailey's treatment of Mrs. Wilson were unfounded and that the real culprit, if there was one, was Williams herself. Specifically, the motion intimated that, after being named Mrs. Wilson's temporary guardian, Williams may have acted improperly with respect to $200,000 in cash Mrs. Williams allegedly kept in her home.[4]

Bailey's motion took issue with respect to Williams' actions with regard to Clifford Service, the elderly man with whom Mrs. Wilson was living at the time Wilson was hospitalized. The reason Bailey professed an interest in Mr. Service is that Service was the father of David Service, whom she had recently married. Bailey complained that Williams, in her capacity as temporary guardian, had dispossessed Mr. Service from Wilson's home when she had no right to do so.

Williams, through her attorney, filed objections to Bailey's motions, denying her claims and contending that Bailey was guilty of unclean hands and had committed deliberate and willful malfeasance "in total disregard of [her] fiduciary obligations to [Mrs. Wilson]." Bailey, in turn, moved to amend her motions in order to challenge, on procedural grounds, the validity of Thiel's appointment as guardian *ad litem* and Williams' appointment as temporary guardian.

The court conducted a hearing on various outstanding matters on June 8, 2006. By the time the hearing commenced, Mrs. Wilson had been transferred to a nursing home known as Halsted Terrace. Williams advised the court that Wilson's mental and physical health

---

[3]Because of the felony convictions, Baily will no longer be eligible to serve as executor of Wilson's estate following Wilson's death. See 755 ILCS 5/6–13(a) (West 2006).

[4]Bailey never attempted to substantiate her initial charges against Williams, and the record contains nothing which suggests that Williams engaged in any form of wrongdoing.

had improved and that she was receiving occupational and physical therapy. Williams was pleased with Wilson's progress.

The court then asked Williams if she had been able to discover anything about Wilson's assets. Williams reported that she had secured Wilson's home and, within two days of her appointment as temporary guardian, had changed the locks to prevent entry by others.[5] Williams described the premises as "dirty, stinky" with a fly problem that had not been present earlier. She also noted that some paperwork which had been missing earlier had returned.

Williams told the court that in the course of her investigation, she had "discovered some very disturbing things." Chief among these was that a substantial account maintained by Wilson at a bank had been emptied by Bailey. The account originally included $187,000. Bailey had withdrawn $25,400 of that in August of 2005 and deposited it in her personal account at a credit union. Three months later, Bailey moved the remaining balance to an account at a different bank. The account retained Wilson's name, but Bailey ultimately withdrew all but $3,000 of it.

Following Williams' testimony, the court gave Bailey's attorney an opportunity to present his views on the case. The lawyer did not address the substance of Williams' contentions. His position was that the court's actions were tantamount to termination of his client's authority under the powers of attorney executed by Mrs. Wilson and that the termination had not been conducted in accordance with statutorily required procedures. Without proper termination, Bailey's counsel argued, the court lacked jurisdiction to appoint Williams as guardian and Thiel as guardian *ad litem*. Bailey's lawyer further asserted that a separate hearing should be conducted to ascertain whether his client had acted in Mrs. Wilson's best interests. He also claimed that his client had not received adequate notice.

Notwithstanding his challenge to the court's authority to proceed, Bailey's lawyer allowed the court to question Bailey, under oath, regarding the financial concerns raised by Williams. Bailey testified

---

[5]The record shows that between the time Mrs. Wilson and Mr. Service were taken to the hospital on May 3 and the time Williams was able to change the locks approximately two weeks later, the only people with access to the premises were Bailey and David Service.

that when she first took charge of Mrs. Wilson's assets in January of 2004, the value of Wilson's estate may have been in excess of $200,000, although she was not sure. On further questioning, she stated that the value may have been $250,000.

Bailey stated that Mrs. Wilson owned the home in which she and Service had been living and that the home had an estimated value of $45,000.[6] Bailey assumed responsibility for seeing that Wilson's bills were paid on time. She advised the court that the bills were all paid and were never in arrears.

According to Bailey, Mrs. Wilson had married Mr. Service, Bailey's father-in-law, in 2005. Bailey claimed that Mrs. Wilson had actually lived with her father-in-law for 15 years prior to the marriage. After the point was raised by Williams, Bailey did not explain why no one in Mrs. Wilson's family knew of the marriage. No documentation of the marriage was ever adduced.

When asked about Mrs. Wilson's mental state, Bailey indicated that she had been responsible for taking Mrs. Wilson to the doctor. Bailey initially claimed that no one had suggested that Mrs. Wilson was suffering from dementia until January of 2006, when a doctor allegedly advised her that Wilson had dementia, but that the dementia was slight and simply "all part of being old." Later, Bailey indicated that an employee from the Department of Aging had told her about Wilson's dementia in November of 2005. When confronted with the fact that Mrs. Wilson had actually been diagnosed as suffering from severe dementia, Bailey claimed that this was the first she had heard of it.

The court next asked Bailey about the withdrawals from Mrs. Wilson's accounts. Bailey stated that she had made the $25,400 withdrawal in November of 2005 because Mrs. Wilson and Mr. Service had asked her to do so. According to Bailey, Wilson and Service had put the money in a box in the closet of Wilson's home because neither one of them believed in banks. Bailey described the box as "a lock box from a safe-deposit" and stated that it already contained approximately $50,000 at the time of she added the $25,400 from the withdrawal. Bailey said that during the previous 10 years, she

---

[6]The value of Wilson's home was ultimately determined to be significantly greater than this estimate.

had frequently checked the contents of the box to make sure it was safe.

According to Bailey, approximately $151,000 was left in the bank account after the $25,400 withdrawal. Bailey testified that Mrs. Wilson directed her to close the account because Mrs. Wilson "had started getting disturbing phone calls from her nephew in California." Bailey stated that she took the account balance, in cash, and put it in the same box in Wilson's closet containing the other money.

Bailey told the court that Mrs. Wilson always carried $10,000 in her purse. When the court questioned whether Bailey's oversight and disposition of Mrs. Wilson's funds was appropriate for a power of attorney, Bailey stated that she could only go by the instructions Mrs. Wilson gave her and denied that Mrs. Wilson was suffering from dementia at the time the withdrawals were made.

Bailey stated that the last time she checked the box in Mrs. Wilson's closet was May 1, 2006, before Mrs. Wilson and Mr. Service were removed from the house. She claimed that aside from an employee of the Department on Aging, the only persons who knew of the box in the closet were her and a caretaker who was sent by the VA to look after Mr. Service. According to Bailey, the closet was locked and the caretaker was never on the premises when she or her husband was not also present.

The court next asked those present in the courtroom whether anyone had any idea where Mrs. Wilson's money was. Bailey stated that "[t]he last time it was in the closet." Williams and the guardian *ad litem* pointed out, however, that numerous checks drawn on Mrs. Wilson's funds had been made payable to Bailey and negotiated by her. These included a check dated August 12, 2005, for $7,500, a check dated August 16 for $3,000, a check dated August 30 for $1,000, a check dated September 8 for $2,000, a check dated October 17 for $7,500, and another check from October in the amount of $3,000. According to Bailey, these sums were used to build an addition on her own home and to have the home rewired in anticipation of having Mrs. Wilson move in with her. When asked why the checks were not made payable to the vendors, Bailey explained that "they take cash."

The court expressed doubt about Bailey's testimony that Wilson was first diagnosed with slight dementia in January 2006, stating: "So

you're telling me she was not diagnosed with dementia until January of '06? You're telling me this under oath," and "It's unusual, I mean, it could happen from January to May [between the purported diagnosis and Heard's petition for disability], four months' time dementia goes from slight to severe."

After Bailey testified that the $25,400 was added to $50,000 already in the box and repeated that she acted only in accordance with Wilson's direction, the court remarked, "The concept of POA [power of attorney] seems to be lost on you." When Bailey testified that the remaining $151,000 in the investment account was subsequently withdrawn and placed in the box, the court told Bailey's attorney, "I don't know how you can ever argue this is appropriate activity by any Power of Attorney."

When Bailey insisted she could "only go by the direction," the court remarked that "[t]aking direction from your demented principal" is "not what the Power of Attorney does." Bailey stated she "checked this box all the time to make sure that [the] money was still there" and had last looked in it on May 1, which was just before Wilson and Service were transported to the hospital on May 3. She also testified that the part-time caretaker "knew nothing about the money" and that the box was kept in a locked closet. When Bailey stated she was "there all the time when the caretaker was there" and David interjected that he was usually there as well, the court responded, "Folks, I don't believe that."

During the court's examination of Bailey, Williams commented that the family was never notified that Wilson and Service had been married in 2005 and she twice remarked that she was "very concerned" by Bailey's depletion of Wilson's assets. The guardian *ad litem* added, "We have a lot of checks endorsed and deposited in various places." Bailey's attorney countered that it was not unheard of for a person to distrust banks and keep large sums of money at home, and the court responded, "If a person who is without disability wants to keep cash in the house go right ahead, but if you're acting as an agent or Power of Attorney, I think that's questionable."

After examining Bailey, the court asked if Williams wanted to file a written response to Bailey's emergency motion for a temporary restraining order, and Williams' attorney declined. The proceedings continued:

"[Williams' attorney]: We can't operate with this Power of Attorney with this lady having control of the funds and person[ ].

THE COURT: [Bailey's] request for TRO is denied.

[Williams' attorney]: Thank you."

This ruling left open the portion of the motion seeking to vacate the appointments of a guardian *ad litem* and temporary guardian and thus restore Bailey's authority under the powers of attorney. The proceedings continued:

"THE COURT: All right. So let's move along here. We need an accounting from your client.

[Ms.Bailey]: I would not have wrote–

[Bailey's attorney]: Are you denying it without a hearing on it?

THE COURT: I've had her under oath for how long now? You want someone to be reinstated who can't even identify where $120,000 is?

* * *

It's appealable if you want to take it up. Do you want to further argue it? Counsel, you want me to reinstate a Power of Attorney. That would be ridiculous for this Court to reinstate a Power of Attorney where I have a very strong suggestion that hundreds of thousands of–

[Ms. Bailey]: I would not have wrote checks in my name if I was trying to do anything [improper]. I can only go by what [Wilson] was telling me. I can only– they're not showing you where all her bills had to be paid.

THE COURT [to Bailey's attorney]: At some point maybe she will account for every penny, that could possibly be, *** that could happen, but until I get an accounting for every penny, maybe everything she says is true, all the money can be accounted for, but if it can't be, I will be remiss to allow her to go back to control her money at this point, okay.

[Bailey's attorney]: *** I will discuss that with my client to see whether she wants to exercise her rights in that regard.

THE COURT: Again, I need an accounting from your client. So this Court is demanding an account[ing] on the Power of Attorney."

-11-

Before concluding the hearing, the court allowed the parties to address the question of Mr. Service, Bailey's father-in-law. Williams asserted that Service's alleged marriage to Mrs. Wilson was a sham, arguing that neither Mrs. Wilson nor Mr. Service had the capacity to enter into a marriage contract. She also disputed Bailey's claim that Mr. Service had resided with Mrs. Wilson for 15 years, pointing out that he owned his own home.

Bailey professed concern that Mr. Service "has nowhere to go." The court asked why Mr. Service could not live with her or in his own home. Bailey explained that Service did not want to live with her and her husband and represented that his own home had been vacant for over a decade, a claim which Williams disputed.

In the course of the proceeding, Bailey advised the court that Mr. Service was currently living in a nursing home. There being no indication that he could not continue to live there during the pendency of the proceedings, the court took no further action regarding his placement.

At the conclusion of the hearing, the court entered a written order denying the emergency injunctive relief Bailey had requested to terminate the appointment of Williams as temporary guardian and the appointment of Theil as guardian *ad litem* and to permit Bailey to continue to exercise her powers of attorney. In a separate order filed the same day, the circuit court ordered Bailey to file an accounting by June 27, 2006. The court also granted the guardian *ad litem* leave to file an emergency petition for revocation of Bailey's authority as Mrs. Wilson's agent and for an accounting.

 The guardian *ad litem's* emergency petition alleged that Mrs. Wilson lacked the capacity to make any personal or financial decisions on her own and that Bailey had not acted for Mrs. Wilson's benefit. The petition was supported by a report from Mrs. Wilson's physician, who stated that Mrs. Wilson suffered from severe dementia and was totally incapable of caring for herself or her affairs.

The June 27 deadline set by the court for filing of an accounting came and passed, but Bailey filed no accounting. Instead, she moved for leave to amend her emergency motion to vacate the order appointing a temporary guardian and for other injunctive relief and an accounting. She also moved to dismiss the guardian *ad litem's* emergency petition to revoke her authority as agent for Mrs. Wilson

and for an accounting.

Supplemental pleadings filed by Bailey indicated that after the previous court hearing, she had been permitted to reenter Mrs. Wilson's home, accompanied by police, to determine whether the cash she described as having been stored in the lock box was still on the premises. When the money could not be located, it was reported as stolen.

Another hearing was convened by the court on June 29, 2006. At the court's request, Williams reported that Mrs. Wilson was still at the Halsted Terrace nursing home. She continued to receive physical and occupational therapy. Her mobility had improved and she was able to make a specific food request, for apple pie. Williams reported that she was able to visit Wilson "at least five days out of seven," and that she was delighted with Wilson's progress.

After hearing complaints by Bailey that she had not been permitted to visit Mrs. Wilson, the court admonished the parties that it had not ordered any restrictions on visitation and that if such restrictions were desired, the temporary guardian would have to specifically request them from the court.

The court next proceeded to the question of the accounting. Bailey's attorney advised the court that he had not been able to communicate effectively with his client on the subject and that materials she had compiled were not in proper form. In addition, he asserted that the documents Bailey would need to complete a proper accounting were still in Mrs. Wilson's house, possession of which had been taken over by Williams. The hearing also included a discussion by the parties regarding the status of Mr. Service, Service's lack of any ownership interest in Wilson's home, the home's condition, and the status of various outstanding requests for relief.

Another hearing was conducted the following week, on July 5, 2006. At the conclusion of that hearing, the court entered orders finding that Mrs. Wilson was "demented and unable to care for herself" and appointing Williams as plenary guardian of Mrs. Wilson's person and estate; denying most of the injunctive and other relief sought by Bailey and setting any remaining requests for relief for a status hearing; continuing the suspension of Bailey's authority under the powers of attorney; allowing replacement counsel to file a supplemental appearance on Williams' behalf; and ordering Bailey to

file a proper accounting on or before July 21, 2006.

Before this next accounting deadline was reached, Bailey filed an interlocutory appeal. The basis for her appeal was her claim, asserted earlier, that the circuit court had lacked jurisdiction to suspend her powers of attorney and appoint a temporary guardian and guardian *ad litem*. The appellate court unanimously rejected this jurisdictional challenge. It further held that circuit court had correctly denied Bailey's motions for a temporary restraining order and preliminary injunction "because she did not and could not articulate the required elements for such relief." *Wilson I*, 373 Ill. App. 3d at 1077. It therefore affirmed the judgment of the circuit court.

Proceedings in the circuit court were not stayed during the pendency of the appeal, and the litigation continued as the interlocutory matters were under review. On September 6, 2006, counsel for Wilson took Bailey's deposition. In the course of that deposition. Bailey admitted taking a total of $42,500 from Wilson for the addition on her own home, a project she had mentioned previously. She further testified that she had used Wilson's funds to buy a stove and refrigerator, pay her cell phone bill and auto insurance premiums, pay attorney fees for her divorce,[7] pay real estate taxes for property in Kankakee owned by her husband's family, purchase a truck for her husband, and cover the funeral expenses of her husband's stepbrother. Bailey testified that Wilson's money was also used to purchase a television and more than $10,000 worth of furniture, to buy clothing, and to pay for such things as a traffic ticket, auto body repairs, and a motel room in Minnesota.

Bailey identified some expenses she attributed to the care of Mrs. Wilson and the maintenance of Wilson's home, but these were modest and none were documented by her at the deposition. Bailey could not, in fact, substantiate any of the payments she had made with Wilson's funds. Indeed, with a few limited exceptions, she was unable to even recall when and to whom Wilson's money had been disbursed.

Within 48 hours of giving her deposition, Bailey filed an amended emergency motion to vacate the court's initial May 15 order

---

[7]The divorce enabled her to marry Mr. Service's son, David. That marriage occurred sometime after the date when, she claimed, Mr. Service married Mrs. Wilson.

appointing Thiel as guardian *ad litem* and Williams as temporary guardian. Shortly thereafter, Bailey also filed a motion to compel Williams to grant her permission to visit Mrs. Wilson outside of Williams' presence and supervision.

While these matters were pending, Williams petitioned for approval from the court to sell Mrs. Wilson's home. According to the petition, Wilson was now in the South Shore Nursing and Rehabilitation Center, it was unlikely she would ever be able to live independently again, the house was vacant, her liquid assets had been depleted, and proceeds from the sale were necessary to pay her current and future expenses.

In addition to seeking permission to sell the house, Williams sought leave to file, *instanter*, an inventory of Wilson's estate. The inventory showed that $7,732.36 remained in Wilson's bank accounts and that she owned a 10-year-old automobile valued at $3,300. Wilson received approximately $18,516 per year in United States Civil Service retirement benefits and $15,345 in Railroad Retirement Benefits payable to her as the widow of Charles Wilson, her deceased husband.[8] In addition, Williams indicated that Wilson had a possible cause of action against Bailey for recovery of her property.

On September 13, 2006, the circuit court entered an order granting Williams' motion for leave to file the inventory *instanter*, permitting Williams to file her request to list the house for sale and setting that matter for a status hearing on October 17, 2006. The court also set for a status hearing on October 17 the matter of the accounting Bailey had been ordered to provide, a petition for fees filed by the guardian *ad litem*, and the question of Bailey's request for unsupervised visitation with Mrs. Wilson. In addition, the court ruled that Bailey's attorney would be permitted to review documents under Williams' control at the office of Williams' lawyer on September 18, 2006.

Shortly thereafter, Williams brought a citation proceeding

---

[8]The existence of these Railroad Retirement benefits was cited as further support of the claim that Wilson would not knowingly have married Mr. Service. Evidence presented in the trial court indicated that when she was still competent, Wilson understood that if she remarried, the Railroad Retirement benefits would cease.

pursuant to section 16–1 of the Probate Act (755 ILCS 5/16–1 (West 2006)) alleging that Bailey had depleted Mrs. Wilson estate by approximately $313,610 while acting as her agent under the powers of attorney and that more than $295,000 of that sum was used by Bailey to enrich herself. The citation petition was supported by Bailey's deposition and a detailed list of checks written or cashed by Bailey using Wilson's bank accounts, cross-referenced with Bailey's deposition responses. According to these documents, Bailey was responsible for spending a total of $297,708.95 of Wilson's money for purposes that Bailey could not show were related, in any way, to Wilson or her care. Williams asked that the court require Bailey to provide for a complete accounting of all the funds she had received from Wilson after exercising authority under the powers of attorney, that it order Bailey to "provide full and complete records to trace the disbursement and distribution of all [such] funds from date of receipt to present," and that it enter an order enjoining Bailey from disposing of her own money, accounts, or property during the interim. A separate motion for preliminary injunctive relief aimed at freezing Bailey's assets was filed by Williams on October 17.

Contemporaneously with the citation proceeding, Williams filed her response to Bailey's amended emergency motion to vacate. She also made a formal motion to revoke Bailey's powers of attorney pursuant to section 2–10 of the Durable Power of Attorney Law (755 ILCS 45/2–10 (West 2006)).[9] In addition, Williams asked that Mrs.

---

[9]In circumstances comparable to those present here, our appellate court has held that a trial court's decision to appoint a plenary guardian constitutes an implicit revocation of an existing power of attorney pursuant to section 2–10 of the Illinois Power of Attorney Act (755 ILCS 45/2–10 (West 2006)). Based on this reasoning, the appellate court rejected an argument that an order appointing a guardian is void where a prior power attorney has not been formally set aside. See *In re Estate of Doyle*, 362 Ill. App. 3d 293, 299 (2005). When Bailey attempted to assert a voidness challenge similar to the one rejected in *In re Estate of Doyle*, Williams countered with a citation to that case. Rather than rest her position on that authority, however, she elected to also file pleadings requesting express revocation of Bailey's powers of attorney. Her purpose in seeking express revocation was to "avoid the opportunity for further redundant motion practice."

Wilson's supposed marriage to Mr. Service be declared invalid. As she had earlier, Williams argued that at the time the marriage was claimed to have occurred, neither Wilson nor Service was competent to enter into a marriage contract.

As we have indicated, the circuit court had scheduled a hearing on various pending matters for October 17, 2006. On the eve of that hearing, Bailey filed a series of papers with the court, including a document entitled "Motion for Substitution of Judge." Although not specified in the document itself, Bailey subsequently indicated that it was predicated on section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)), which governs motions for substitution of judges, for cause, in civil actions pending in the circuit court. That statute provides, in part, that

"[e]very application for substitution of judge for cause shall be made by petition, setting forth the specific cause for substitution and praying a substitution of judge. The petition shall be verified by the affidavit of the applicant." 735 ILCS 5/2–1001(a)(3)(ii) (West 2006).

Bailey's motion did not seek to bar the trial judge from all participation in the case. It merely asked that "the motion to revoke powers of attorney" be transferred for a hearing before a different judge. As grounds for that motion, Bailey asserted that the trial judge had indicated that "she did not believe Karen Bailey" after questioning her on matters "of an adverse nature" at the June 8, 2006, hearing. According to the motion, it was Bailey's belief that the judge "would be predisposed not to believe her at a hearing on the pending motion of Arnetta Williams to revoke the powers of attorney and [that she] would not receive a fair and impartial hearing." The motion was signed by Bailey and Bailey's lawyer in their capacity "as Agent of the Power of Attorney." It was not verified by affidavit or otherwise.

Approximately two weeks later, on November 2, 2006, Bailey filed a document labeled "amended motion for reassignment of case." It included no substantive allegations regarding the basis for the motion. It merely stated that Bailey "has filed a Motion for Substitution of Judge" and that "735ILCS 5/2–100(iii) [*sic*] provides that '*** upon the filing of a petition for substitution of judge for cause, a hearing whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition

-17-

\*\*\*.' "

Williams filed a response to Bailey's motion to substitute which included a summary of the case, a transcript of the June 8, 2006, hearing, and an overview of the applicable law. Based on these materials, Williams argued that Bailey's request for substitution should be denied because: (1) it was not asserted until over four months after the events on which it was based, (2) it was filed without the statutorily required verification, (3) the bias or prejudice it claimed did not stem from an extrajudicial source and was therefore insufficient, as a matter of law, to justify a substitution of judge, and (4) Bailey waited to file it until the day numerous pending matters were scheduled for a hearing and it is "nothing more than a transparent attempt to delay the proceedings with the ancillary goal of engaging in a little judge shopping."

After Bailey filed a written reply to Williams' response, the circuit court held a hearing on the matter. Bailey, the appellant in the appellate court, failed to include either a transcript or bystander's report of that hearing in the record on appeal. The record shows only that after the hearing, the circuit court entered a written order denying Bailey's motion.

Various proceedings followed. Williams sought and was granted leave to sell Mrs. Wilson's home, the only remaining thing of significant value in Wilson's estate, in order to pay Wilson's current and future expenses. Williams was also authorized to initiate annulment proceedings, and the marriage between Wilson and Service, if one ever took place, was ultimately annulled by court order under a separate docket number. The attorney for Williams, Wilson's plenary guardian, filed two requests for attorney fees and expenses, both of which were allowed. The court also awarded fees to the guardian *ad litem*. In addition, the court permitted Mr. Service to visit her.[10]

On November 20, 2006, the judge commenced a hearing on Williams' formal motion to revoke Bailey's powers of attorney and on Williams' demand that Bailey provide an accounting. The hearing took place over approximately 10 days between November 20, 2006, and March 29, 2007. During the course of the hearing, testimony was

---

[10]The record suggests that Mr. Service in now deceased.

presented by Bailey;[11] Donald Devitt, an employee of an organization known as Metropolitan Family Services; David Service; Williams; nurse Ponce De Leon; and Charlene Valentine, an employee of the Department of Aging.

Bailey's testimony, though extensive, shed little additional light on what she had done with Mrs. Wilson's money after withdrawing it from Wilson's accounts. Much of what she had to say paralleled evidence submitted earlier, *e.g.*, that she had used substantial sums for improvements to her own home, for funeral expenses for one of her husband's relatives, to purchase a truck for her husband, and to pay for her own taxes, insurance, attorney fees for her previous divorce, and other expenses. She admitted using Mrs. Wilson's money to buy herself a Chrysler PT Cruiser automobile, which she later traded for a Mercedes, and explained that $1,200 was paid to her boss because her boss had previously advanced funds to help pay for her husband's relative's funeral. In addition, more than $200,000 was withdrawn by Bailey from Mrs. Wilson's accounts and could not be traced at all. In most cases, Bailey simply claimed that she had no recollection of what she had done with the money, including $85,000 withdrawn on a single day in January of 2006.

Following Bailey's testimony, including her cross-examination, the proceedings adjourned. They did not resume for approximately two months. At that time, counsel for Bailey was granted leave to withdraw and was replaced by successor counsel, who filed a jury demand, which was denied. Successor counsel also attempted, unsuccessfully, to raise various issues pertaining to the guardian's petition for fees and expenses and whether a need remained for the guardian *ad litem*.

When the proceedings resumed, Bailey was recalled to the stand to give rebuttal testimony. Her new lawyer elicited from her that when she first began working for the Cook County board of commissioners,

---

[11]Although Bailey previously stated that she was married to Mr. Service's son, David Service, she identified herself at this hearing as Karen Bailey Arnold. She did not explain the new name. During the hearing on the motion to revoke her powers of attorney, she indicated that she had separated from David and was in the process of getting a divorce from him, but since the divorce was not finalized, she could not yet have legally remarried.

she had undergone criminal background checks and checks for drug use and that everything came out fine. Bailey recounted how she had first met Wilson and stated that her husband's father, Mr. Service, had been best friends with Wilson's husband, who was now deceased. According to Bailey, Service came to live with the Wilsons when Mr. Wilson was ill and continued to live at Mrs. Wilson's house following Mr. Wilson's death. Bailey stated that she had known Mrs. Wilson for approximately a dozen years and had begun acting under a power of attorney from her in 2004.

Bailey described how the powers of attorney were executed by Mrs. Wilson in her boss' office in the presence of "at least 5 or 6 people." She asserted that money in Wilson's possession had actually come from Mr. Service and the estate of Service's deceased wife. She stated that she, Bailey, was not a wealthy woman. Notwithstanding her previous testimony regarding, *e.g.*, the substantial home improvements she had paid for in cash, she claimed she had not made any large cash purchases in the past two years. In response to questioning regarding her inability to produce receipts related to expenditures she claimed to have made on Mrs. Wilson's behalf, Bailey asserted that the receipts had been kept in a box at Wilson's house and that the box had been stolen, along with cash and items of personal property.

Following Bailey's rebuttal testimony, her lawyer called as a witness Donald Devitt. Devitt testified that he is an elder abuse case worker for Metropolitan Family Services and that his duties include responding to reports of abuse, neglect, and exploitation of elderly persons. Devitt testified that he visited Mrs. Wilson's home on five occasions between January and March of 2006 in response to complaints that Bailey and David Service were abusing Mr. Service. The days he visited, he found conditions in the home to be safe and sanitary and observed adequate food on the premises.

Most of Mr. Devitt's contact was with Mr. Service. He had little direct communication with Mrs. Wilson during his visits to her home. When he attempted to speak directly to Mrs. Wilson, Mr. Service would typically answer for her. Devitt testified that he did not complete his investigation because he was never able to obtain a full financial accounting. He stated, however, that he observed no signs that Mrs. Wilson had been physically abused and that when he spoke

to her at the hospital after her removal from the house, she appeared coherent. He also expressed the opinion that Wilson and Service "appeared well cared for [and] had the necessities for daily living."

Following Devitt's testimony, Bailey's attorney called David Service as his next witness. David testified that he is a professional musician and had just performed with Bailey's boss, who is also a professional musician. David stated that in addition to being a musician, he trains horses and is licensed to buy and sell them. When asked whether he and Bailey were in the process of getting a divorce, as Bailey had claimed, he denied it.

David related that he has known Mrs. Wilson since he was a child. He backed Bailey's claim that his father and Mrs. Wilson had lived together for many years and had married within the last two years. David testified that his father and Mrs. Wilson commingled their funds and that those funds were the source of payment for the room addition disclosed by Bailey. David stated that he helped care for his father at Wilson's house and that after his father and Wilson were removed from the premises, his father eventually ended up living alone in an apartment complex for senior citizens.

David testified that his father objected to being removed from Wilson's house and was not in distress when he and Mrs. Wilson were taken to the hospital. David testified that a power of attorney executed by his father had been prepared long before 2006, notwithstanding the evidence showing that the forms had not been purchased by Bailey prior to February of 2006. He also claimed that in 2004, he was among the persons who witnessed Wilson sign forms giving Bailey powers of attorney with respect to Wilson's property and health care, again contradicting the evidence which demonstrated that the forms Wilson had signed had not even been purchased by Bailey until 2006. He initially denied using any of Wilson's assets, but eventually admitted that he had used checks drawn on her account to buy himself a four-door pickup truck.

Bailey's attorney next called Williams as an adverse witness. On questioning from counsel, Williams described her work history, her relationship with Wilson, and the circumstances under which she became involved in Wilson's care. She described how she had hired a professional photographer to document the home's condition before she began cleaning it up. She testified that she never saw a box with

a lot of cash in it, had never heard anyone claim that such a box existed before the court proceedings commenced, and did not believe that there was such a box.

Williams described going to Mrs. Wilson's house on the evening of May 3, 2006, after reporting Wilson's poor living conditions to the City. She had hired a plumber to restore running water to the sink in Wilson's bathroom, but the plumber had not been able to gain entry to the premises. When the plumber arrived, Clifford Service advised him that he was locked inside and could not open the door. Williams reported that a caregiver was supposed to have been on the premises around the clock but that on this day, no one was there. Williams denied telling anyone from the City that she wanted Mrs. Wilson removed from the home and hospitalized.

Following Williams testimony, Bailey's lawyer recalled her to the stand to identify some financial records. In explaining why the records remained incomplete, she repeated her previous claim that the originals had been kept in a box which had since gone missing. The documents she was able to produce pertained, for the most part, to matters Bailey had previously addressed. With respect to the truck her husband had bought with a check drawn on Wilson's account, Bailey added a new detail, namely, that Wilson had wanted the family to have the truck so that she would be able to visit a horse David Service had purchased for her.[12] Bailey also identified one of the checks issued to David as payment for horse feed. In addition, Bailey claimed that many of the checks she had cashed represented funds which Wilson wanted to take out of the bank and keep in a secret box in her home.

Included among the documents were cash register receipts for miscellaneous items purchased by Bailey between 2005 and 2006 from various retail stores, including Target, Wal-Mart, Kohl's, Sears, Lowe's, Burlington Coat Factory, JC Penney, and K's Merchandise City. Among the items listed on the receipts were two sets of bedroom furniture which were apparently part of a donation to a women's

---

[12]Later, Bailey went so far as to claim that her husband took Wilson to visit the horse at least three or four times a week over the past seven or eight years. She later increased this to "maybe four or five times a week." Still later, she asserted that during this period, Wilson, who had undergone hip replacement surgery, actually *rode* the horse five times a week.

shelter in Joliet; four "mega meal dinners" at Ryan's; computer software; and numerous items of men's and women's clothing, as well as a variety of food items and toiletries. The documents also included a few utility bills, receipts for two refrigerators, a receipt for auto body work, and a number of other items. In all, the expenditures reflected by these receipts from merchants represented but a tiny fraction of the total funds taken from Wilson's accounts. Bailey admitted she did not separate out expenditures made on behalf of Mr. Service rather than Wilson. She explained this by saying that "no one ever told me that I had to separate them."

After Bailey's rebuttal testimony concluded, the proceedings adjourned. At a subsequent hearing, the court approved the sale of Wilson's home and granted the guardian's request for an award of fees. It then heard testimony from nurse Ponce De Leon. Ponce De Leon stated that she was a public health nurse employed by the City of Chicago's Department on Aging. She recounted the history of her visits to Wilson's house beginning in 2006. Ponce De Leon thought that the complaints her agency had received regarding Wilson's care had originated with Williams. She stated that on May 3, when Mrs. Wilson and Mr. Service were removed from the home, she asked the police to be present. The rooms of the house she observed were "okay" in terms of cleanliness, there was heat, food was in the refrigerator, and she did not notice any foul odors.

Ponce De Leon told the court that Mrs. Wilson complained that she and Mr. Service did not have their medications and that Mr. Service asked that he and Mrs. Wilson be taken to the hospital. Ponce De Leon asked the police office on the scene to witness her conversation with Wilson and Service and reported that during that conversation, Mr. Service told Wilson, "You are finally going to get help." According to Ponce De Leon, Service repeated this assurance to Wilson. Ponce De Leon also recalled Service and Wilson complaining that someone was taking their checks. In Ponce De Leon's opinion, Wilson and Service appeared frail. Mr. Service was confused. Neither one was oriented. Ponce De Leon reported that after the two were admitted to the hospital for treatment, Wilson told her that someone had been slapping her.

The final witness to testify was Charlene Valentine, nurse Ponce De Leon's supervisor at the Department on Aging. Valentine

recounted that Mr. Service and Mrs. Wilson first came to her attention in 2004 on a referral from Ingles Hospital. The referral indicated that Service was

> "in pain, bills and resides with girlfriend. May not have operating heat. Possible confusion. No other means of support. The girlfriend, Mary Wilson, is in the home and may have issues as well."

Valentine went to the home to check on the pair. As a result of her visit, she ordered various services for them including meals on wheels, the assistance of a homemaker, and help with getting their heat restored. According to Valentine, the utilities had been disconnected. These developments occurred on January 6, 2004.

Between that date and 2006, the Department on Aging received numerous calls requesting assistance for Mrs. Wilson and Mr. Service. Among the contacts was a request in April of 2005 from a social worker at Rush University Medical Center asking that Wilson be evaluated. The social worker's report was that Wilson "may not be eating adequately. Not taking medications. There is a garbage odor in the home and client is confused."

Valentine's understanding was that despite the recommendations for services, Mrs. Wilson and Mr. Service were not receiving homemaker assistance, meals on wheels or other help in the house. Health care workers made repeated reports between 2003 and 2006 that they could not get into the house to see Wilson and Service. Two calls for help were made by Mrs. Wilson herself, one in 2004 following her hip surgery, and a second in 2005 requesting homemaking and other services. A call in 2006 reported that Service and Wilson were having money taken away from them.

Following Valentine's testimony, Bailey was recalled to the stand to provide more testimony regarding the funds withdrawn from Mrs. Wilson's accounts. In this round of testimony, Bailey asserted that $21,000 of the funds paid to her from Wilson's accounts actually represented the repayment of a loan she had made to Wilson. She identified checks written on Mrs. Wilson's account and used to pay for a $200 traffic ticket issued to her (Bailey) by the Village of Orland Park, her AAA auto club membership fees, her cell phone bill, attorney fees from her prior divorce lawyers, her real estate taxes, and the funeral expenses for her husband's stepbrother. She also

confirmed the authenticity of numerous other checks she had issued to herself or David Service from Mrs. Wilson's accounts.

At the conclusion of the evidence and after hearing closing arguments, the circuit court granted William's petition to revoke Bailey's powers of attorney and for an accounting, formally revoked Bailey's powers of attorney, found that Bailey had breached her fiduciary duties to Mrs. Wilson, and ordered Bailey to repay Wilson's estate the sum of $297,708.95. The court's written judgment was filed March 29, 2007. Bailey promptly appealed, arguing: (1) that the circuit court committed reversible error when it failed to refer her motion for substitution of judge to another judge for a hearing, (2) that Williams' petition to revoke her powers of attorney and for an accounting should have been dismissed, (3) that the circuit court's judgment revoking Bailey's powers of attorney was against the manifest weight of the evidence, and (4) that the dollar amount of the judgment entered by the circuit court was not supported by the record.

In a published opinion, a divided appellate court vacated the circuit court's judgment and remanded the cause for further proceedings. Two of the three judges on the appellate court panel agreed with Bailey that her petition for substitution should have been automatically referred to another judge for consideration as soon as it was filed. Because the petition was not referred to a different judge, the majority reasoned that all subsequent actions taken by the trial judge in the case were void. It therefore vacated the circuit court's judgment and remanded for further proceedings. In light of this disposition, it did not reach any of the other grounds for reversal urged by Bailey. 389 Ill. App. 3d at 786.

The dissenting justice rejected the majority's reasoning. In his view, automatic referral to another judge is not required in every case. It is necessary only where the petitioner is able to make a threshold showing of bias supported by the statutorily required affidavit. Because the dissenting justice believed that that neither of those conditions had been satisfied in this case and that circumstances suggested "that the purpose of the petition may have been merely to delay the proceedings," he would have affirmed the circuit court's denial of the petition for substitution. As with the majority, he did not reach the additional issues raised by Bailey as grounds for reversal.

389 Ill. App. 3d at 787-94 (O'Malley, J., dissenting).

Following entry of the appellate court's judgment, Williams petitioned our court for leave to appeal (210 Ill. 2d R. 315), which we allowed. We also allowed the Cook County public guardian leave to file a brief as friend of the court.

## ANALYSIS

Because the appellate court's judgment rests on the interpretation and application of section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)), we begin our review with an examination of that statute. Statutory construction presents a question of law which we review *de novo. Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 35 (2009).

Section 2–1001(a)(3) authorizes each party in a civil case to seek substitution of the trial judge for cause and sets forth the requirements governing such requests. It provides, in relevant part:

> "(ii) Every application for substitution of judge for cause shall be made by petition, setting forth the specific cause for substitution and praying a substitution of judge. The petition shall be verified by the affidavit of the applicant.
>
> (iii) Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition. The judge named in the petition need not testify but may submit an affidavit if the judge wishes. If the petition is allowed, the case shall be assigned to a judge not named in the petition. If the petition is denied, the case shall be assigned back to the judge named in the petition." 735 ILCS 5/2–1001(a)(3)(ii), (a)(3)(iii) (West 2006).

Section 2–1001(a)(3), is the civil counterpart to section 114–5(d) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114–5(d) (West 2006)), which states:

> "[A]ny defendant may move at any time for substitution of judge for cause, supported by affidavit. Upon the filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion ***." 725 ILCS 5/114–5(d) (West 2006).

The courts of this state have held that the provisions of both statutes are to be liberally construed to promote rather than defeat the right of substitution, particularly where the "cause" claimed by the petitioner is that the trial judge is prejudiced against him. *People v. Jones*, 197 Ill. 2d 346, 352 (2001); see *In re Estate of Gagliardo*, 391 Ill. App. 3d 343, 346-47 (2009). The courts have also recognized, however, that a party's right to have a petition for substitution heard by another judge is not automatic. See *People v. Damnitz*, 269 Ill. App. 3d 51, 55 (1994); *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d 644, 649 (1997); *City of Quincy v. Weinberg*, 363 Ill. App. 3d 654, 662 (2006); *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 248 (2006); *Williams v. Estate of Cole*, 393 Ill. App. 3d 771, 776 (2009). Principles of liberal construction do not excuse the obligation of parties to adhere to express statutory requirements. See *People v. Van Pelt*, 18 Ill. App. 3d 1087, 1089 (1974). Trial courts are required to refer a petition to another judge for a hearing on whether cause for substitution exists only if the party seeking that relief is able to bring himself or herself within the provisions of the law. See *Hoffmann v. Hoffmann*, 40 Ill. 2d 344, 347-48 (1968).

In order to trigger the right to a hearing before another judge on the question of whether substitution for cause is warranted in a civil case pursuant to section 2–1001(a)(3), the request must be made by petition, the petition must set forth the specific cause for substitution, and the petition must be verified by affidavit. 735 ILCS 5/2–1001(a)(3)(ii) (West 2006). The requirements in criminal cases are similar. See 725 ILCS 5/114–5(d) (West 2006).

In the case before us, Bailey's request for substitution satisfies only the first of these three requirements. It was made by petition. The remaining requirements were not met. The petition was not verified by affidavit, and it did not adequately allege cause for substitution.

To meet the statute's threshold requirements, a petition for substitution must allege grounds that, if true, would justify granting substitution for cause. *In re Estate of Hoellen*, 367 Ill. App. 3d at 248, quoting *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d at 649. Where bias or prejudice is invoked as the basis for seeking substitution, it must normally stem from an extrajudicial source, *i.e.*, from a source other than from what the judge learned from her participation in the case before her. A judge's previous rulings almost

-27-

never constitute a valid basis for a claim of judicial bias or partiality. See *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d at 649; *Williams v. Estate of Cole*, 393 Ill. App. 3d at 777. As our court noted in *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002), quoting *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 491, 114 S. Ct. 1147, 1157 (1994):

> " '[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " (Emphases in original.)

In the case before us, the sole "cause" alleged as grounds for substitution was that, based on previous remarks she had made following Bailey's testimony, the trial judge might be "predisposed not to believe [Bailey] at a hearing on the pending motions of *** Williams to revoke the powers of attorney." An assessment of a party's credibility as a witness based on the evidence presented in the course of the proceedings is a matter " 'which is clearly within the purview of the trial court' " and does not rise to the level of deep-seated favoritism or antagonism that would make fair judgment impossible. See *Eychaner v. Gross*, 202 Ill. 2d at 281, quoting *McCormick v. McCormick*, 180 Ill. App. 3d 184, 194 (1988). For this reason, even if we took Bailey's allegations as true, they would not suffice to establish "cause" for substitution within the meaning of section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)). Accordingly, the trial court had no obligation under the statute to refer the matter to another judge for a hearing. See *People v. Damnitz*, 269 Ill. App. 3d at 55; *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d at 649-50; *In re Estate of Hoellen*, 367 Ill. App. 3d at 249; *Williams v. Estate of Cole*, 393 Ill. App. 3d at 776-77.

In her brief, Bailey also asserts that in questioning her as she did at

the June 8, 2006, hearing, the trial judge disregarded her role as a judge and impermissibly assumed the role of an advocate. This contention is wholly without merit. As a preliminary matter, no such allegation was contained in the petition for substitution itself, and Bailey has not explained how the trial court can be faulted for denying a petition to substitute based on an allegation she did not make.

Bailey's argument also overlooks the nature of these proceedings. The case was brought as a guardianship proceeding under article XIa of the Probate Act of 1975 (755 ILCS 5/11a–1 *et seq.* (West 2006)). The court's role in guardianship proceedings differs from its customary function in civil and criminal proceedings. See, *e.g.*, *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991) (applying comparable provisions of the Juvenile Court Act). It has a specific statutory obligation to inquire, itself, into any matters it deems appropriate regarding a respondent's circumstances. See 755 ILCS 5/11a–11(e) (West 2006). The trial court here did no more than that. While it is true that the court expressed skepticism regarding Bailey's testimony and the propriety of her conduct, it can scarcely be claimed, given the facts of this case, that the court's skepticism was in any way unjustified.

Finally, if Bailey had any complaints regarding the court's conduct of the trial proceedings, it was incumbent upon her to voice those objections in the trial court in the first instance. She failed to do so. The record shows that Bailey testified willingly during the hearing and that neither she nor her lawyer made any objection to the manner in which she was questioned by the court. Bailey is therefore precluded from raising such objections now. See *People v. A Parcel of Property Commonly Known As 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 504 (2005); *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 104 (1991).

Beyond the lack of an affidavit and the failure to allege a legally sufficient basis for finding "cause," Bailey's request for substitution was properly rejected by the trial court for two additional reasons. First, it came too late. As with its criminal counterpart, section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)) does not contain a specific time frame within which requests for substitution of judge must be asserted. We have held, however, that motions for substitution based on cause in both civil and criminal cases must be asserted at the "earliest practical

moment" after the cause for the request has been discovered. See *In re Marriage of Kozloff*, 101 Ill. 2d 526, 532 (1984); *People v. Jones*, 197 Ill. 2d at 356. That clearly did not happen here. The hearing which was the basis for Bailey's petition for substitution took place on June 8, 2006. Thereafter, numerous matters were filed, hearings were held, and orders were entered. Throughout this period, Bailey made no complaint that considerations of bias should prevent the trial judge from continuing to preside over the case. Bailey did not petition for substitution until October 16, 2006, more than four months later. Bailey has offered no justification for this delay.

Second, we have long recognized that courts may take cognizance of the circumstances surrounding a motion for substitution of judge and inquire into the good faith of the motion. Where it is apparent that the request is not made in good faith but for purposes of delay, the denial of a motion to substitute does not constitute error. See *Hoffmann v. Hoffmann*, 40 Ill. 2d at 348; *People v. Peterson*, 70 Ill. App. 3d 205, 207-08 (1979). This is such a case.

As we have just noted, numerous proceedings were held before Bailey filed her petition based on the trial court's actions at the June 8 hearing. In none of those instances was the trial court's alleged bias an issue. What differentiated the impending October hearing from prior hearings, where the issue of bias was never raised, is that, by this time, Williams had taken Bailey's deposition and filed it with the court in support of her citation proceeding. The deposition strongly corroborated concerns expressed by the trial judge at the June 8, 2006, regarding Bailey's mishandling of Mrs. Wilson's affairs. With this development, Bailey surely understood, if she had not understood earlier, that her prospects of prevailing were rapidly diminishing.

The petition for substitution offered the possibility that, at least temporarily, attention would be shifted away from the merits of the case and that she might gain additional time to devise some way to forestall being stripped of her powers of attorney and having to answer for expenditures she was never able to document or justify. If the timing of the petition had some explanation other than delay, it is not evident in the record. Bailey herself has certainly suggested none. The petition's lack of detail and the fact that no one was willing to attest to the veracity of its allegations bolster our conclusion that it was nothing more than a last-minute effort to derail the proceedings. Under these

circumstances, it was not error for the trial judge to deny the petition for substitution without referring it to another judge for a hearing on the merits of whether cause for substitution could be established.

Neither *In re Marriage of Schweihs*, 272 Ill. App. 3d 653 (1995), nor *Jiffy Lube International, Inc. v. Agarwal*, 277 Ill. App. 3d 722 (1996), two appellate court decisions cited by the appellate court majority in this case, supports a contrary conclusion. Both addressed section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)), but neither involved the question presented by this case. In *Schweihs*, the statute had recently been amended to assume its current form, and the pivotal issue was the standard of review governing determinations, on the merits, as to whether cause exists to warrant substitution of the trial judge. The court concluded that such determinations would not be set aside unless contrary to the manifest weight of the evidence. See *In re Marriage of Schweihs*, 272 Ill. App. 3d at 659. That, of course, is not an issue here. The standard of review governing determinations on the merits is not pertinent to this case because in this case the merits were not reached. Threshold deficiencies in Bailey's petition prevented it from being transferred to another a judge for a determination as to whether she could establish cause for substitution. *In re Marriage of Schweihs* is therefore inapposite.

In *Jiffy Lube International, Inc. v. Agarwal*, 277 Ill. App. 3d 722 (1996), the court applied the plain language of section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)) to conclude held that the defendant's motion for substitution of judge should not have been heard by the judge named in the petition. In so doing, however, it did not hold, directly or indirectly, that petitions for substitution were in some way exempt from the threshold requirements we have discussed in this opinion. To the contrary, referencing our prior opinion in *In re Marriage of Kozloff*, 101 Ill. 2d 526 (1984), the court recognized that a petition for substitution could be dismissed as untimely where it was not filed at the earliest practical moment after the prejudice was discovered. It went on to conclude, however, that a timeliness challenge could not be successfully asserted in the case before it because, under facts of the case, the petition was timely. *Jiffy Lube International, Inc. v. Agarwal*, 277 Ill. App. 3d at 727.

The appellate court majority also believed there was support for its

position in the language of section 2–1001(a)(3) (735 ILCS 5/2–1001(a)(3) (West 2006)) itself. In the appellate court's view, "the statute clearly and unambiguously states, without condition or equivocation, that when a civil litigant asserts his or her rights under this law, the action is to be transferred for hearing before another member of the judiciary." 389 Ill. App. 3d at 782. Citing the rule of statutory construction that courts have no authority to depart from the plain language of a law by reading into it exceptions, limitations, or conditions that the legislature did not express, the court reasoned that section 2–1001(a)(3) "does not authorize an Illinois judge accused of bias or prejudice in a civil proceeding to control the disposition of a petition seeking change of judge for cause." 389 Ill. App. 3d at 782. While the appellate court initially suggested that a trial court's obligation to refer a petition to another judge was only triggered if the petition was "in proper form," it stated, immediately thereafter, that a trial judge who is the subject of a motion to substitute should not even consider the basic question of "whether the petition is supported by a sworn statement containing facts personally known to the declarant and the declarant's signature." In the appellate court's view, that was among the "questions that are properly addressed by a judge whose impartiality is not in dispute." 389 Ill. App. 3d at 782.

The appellate court is entirely correct that courts should normally apply the language of statutes as written. What the appellate court's analysis overlooks is that there is an important exception to this principle. When undertaking the interpretation of a statute, we must presume that when the legislature enacted the law, it did not intend to produce absurd, inconvenient or unjust results. *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007). Accordingly, where a plain or literal application of a statute would produce such results, the literal reading must yield. *People v. Hanna*, 207 Ill. 2d 486, 498 (2003).

Such is the case here. If it were literally true that a hearing on whether there was cause for substitution had to be conducted by another judge "[u]pon the filing of a petition for substitution" (735 ILCS 5/2–1001(a)(3)(iii) (West 2006)), an unscrupulous litigant could effectively bring an immediate halt to any pending civil case, at any time, without regard to when the basis for the petition for substitution was discovered, without regard to whether the petition set forth the specific cause for which substitution was requested, and without regard

to whether the petition was accompanied by the affidavit of the applicant or met any other procedural requirements to which civil proceedings are normally subject. The disruption this could create for the conduct of litigation is self-evident.

Empowering litigants to unilaterally halt pending trial proceedings without first meeting any threshold timing, pleading, or procedural requirements would be unprecedented in our system of justice. Neither Bailey nor the appellate court majority has cited any other instance in which it is permitted. If the General Assembly had intended to permit it here, it would not have included the pleading and affidavit requirements in the preceding subsection of the statute (see 735 ILCS 5/2–1001(a)(3)(ii) (West 2006)). The view urged by Bailey and adopted by the appellate court renders those requirements all but meaningless. In so doing, it contravenes the long-established principle that statutes should be construed, if possible, so that effect may be given to all of their provisions; so that no part will be inoperative or superfluous, void or insignificant; and so that one section will not destroy another. *Gay v. Kohlsaat*, 223 Ill. 260, 270 (1906).

The potential for abuse which would result from the appellate court's view of the law cannot be avoided under the theory that questions of timing, specificity, and adherence to procedural requirements may still be addressed by the judge to whom the petition for substitution is referred. That is so for two reasons. First, such an approach would, itself, require deviation from the literal terms of the statute. The statute does not, after all, call for the second judge to conduct a hearing on the petition for substitution in general. What the second judge is to consider is more specific. The hearing before that judge is simply "to determine whether the cause [for substitution] exists." 735 ILCS 5/2–1001(a)(3)(iii) (West 2006). Such an inquiry goes directly to the ultimate merits of the petitioner's claim of cause, a matter on which the threshold timing, pleading, and procedural requirements have no direct bearing.

Second, if a petition's adherence to basic timing, pleading, and procedural requirements could not be challenged until the matter was referred to a second judge, the potential for abuse would remain. Any case could still be stopped at any time, no matter how frivolous the charge of "cause" for substitution might be. Even if the second judge acted expeditiously to resolve challenges to the petition's timing,

sufficiency, and compliance with procedural requirements, the underlying proceedings will have been interrupted and delayed. This is more than a question of inconvenience. Such delays can have critical significance, particularly in cases such as this one, where parties or witnesses are old or infirm or their personal welfare is in immediate jeopardy.

The provision in section 2–1001(a)(3)(iii) (735 ILCS 5/2–1001(a)(3)(iii) (West 2006)) calling for the hearing on cause to be conducted by a judge other than the judge named in the petition was added by the General Assembly effective January 1, 1993. At that time, a comparable statute governing criminal cases was already in effect and had been construed by the courts of Illinois on numerous occasions. The statute was section 114–5(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 114–5(d)), codified prior to 1987 amendments as section 114–5(c) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 114–5(c)).[13] As with sections 2–1001(a)(3)(ii) and (a)(3)(iii) (735 ILCS 5/2–1001(a)(3)(ii), (a)(3)(iii) (West 2006)), that statute allowed litigants to move for substitution of judge for cause at any time, supported by affidavit. The statute further provided that "[u]pon the filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion ***." Ill. Rev. Stat. 1991, ch. 38, par. 114–5(d); Ill. Rev. Stat. 1985, ch. 38, par. 114—5(c).

The language in section 114–5(d) is virtually identical to that later employed by the General Assembly in section 2–1001(a)(3)(iii) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3)(iii) (West 2006)). Significantly, that language was never understood to impose on trial judges an obligation to automatically refer out every motion for substitution which came before them, regardless of whether the motion complied with procedural and or substantive requirements. To the contrary, as the statute was interpreted by the courts, a trial judge could deny a motion to substitute without referring it to another judge for a hearing if the motion was not made at the earliest practical

---

[13]The 1987 amendment did not change the substantive provisions of the statute. It extended the right to seek substitution of a judge for cause to the State. Previously, only defendants enjoyed that right. See *People ex rel. Baricevic v. Wharton*, 136 Ill. 2d 423, 430 (1990).

moment after discovery of the cause alleged in the motion (*People v. Taylor*, 101 Ill. 2d 508, 518 (1984)); was not accompanied by the requisite affidavit (see *People v. Clay*, 124 Ill. App. 3d 140, 147 (1984)); lacked specificity (see *People v. Marshall*, 165 Ill. App. 3d 968, 975 (1988), cited with approval in *People v. Johnson*, 159 Ill. 2d 97, 123 (1994)), or was not made in good faith but rather for purposes of delay (*People v. Peterson*, 70 Ill. App. 3d at 207-08). Moreover, the courts consistently recognized that in order for alleged bias or prejudice of a trial judge to trigger disqualification, it must have stemmed from an extrajudicial source and resulted in an opinion on the merits on some basis other than what the judge learned from his participation in the case. See *People v. Butler*, 137 Ill. App. 3d 704, 720 (1985); *People v. Massarella*, 80 Ill. App. 3d 552, 565 (1979).

We presume that when the legislature adopted section 2–1001(a)(3) (735 ILCS 5/2–1001(a)(3) (West 2006)) in its present form, it was aware of the case law construing the parallel provisions in section 114–5(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 114–5(d)). See *Roth v. Illinois Insurance Guaranty Fund*, 366 Ill. App. 3d 787, 794 (2006) (where statutes are enacted after judicial opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law). Because the statutes deal with similar subject matter, we further assume that by using the same language in section 2–1001(a)(3) as it did in section 114–5(d), the legislature intended for it to be construed and applied similarly. See *Board of Education of City of Chicago v. A, C & S, Inc*., 131 Ill. 2d 428, 468 (1989); *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 512 (2007). Accordingly, just as section 114–5(d) permits trial judges to assess whether motions for substitution for cause in criminal cases meet certain threshold procedural and substantive requirements before referring them to another judge for a hearing on the merits, we believe that the legislature intended for section 2–1001(a)(3) of the Code of Civil Procedure to permit trial judges to assess whether motions for substitution for cause meet the same threshold procedural and substantive requirements in civil cases.

Courts in the federal system have reached the same conclusion when construing and applying analogous provisions of federal law. Federal district courts are governed by 28 U.S.C. §144, which

authorizes parties to obtain a substitution of judge on the grounds that the original trial judge has a personal bias or prejudice against them or in favor of an adverse party. As with a motion to substitute under section 2–1001(a)(3) of the Code of Civil Procedure, a motion seeking relief under 28 U.S.C. §144 must be supported by affidavit. The statute further provides that whenever a timely and sufficient affidavit is made and filed, the "judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." 28 U.S.C. §144.

If 28 U.S.C. §144 were construed in the same narrow and literal manner as Bailey urges us to construe section 2–1001(a)(3) of the Code of Civil Procedure, a trial judge's obligation to remove himself from the proceedings would be automatic. Such a construction, however, has been consistently rejected. Recognizing the need to protect against delay and disruption of the judicial process (see *United States v. Womack*, 454 F.2d 1337, 1341 (5th Cir. 1972)) and frivolous attacks on the courts' dignity and integrity (*Rademacher v. City of Phoenix*, 442 F. Supp. 27, 28 (D. Ariz. 1977)), federal courts have, instead, adopted an approach which parallels that taken by the courts of Illinois. They have held that while the statute may appear, on its face, to require automatic disqualification once the affidavit has been filed (see *Easley v. University of Michigan Board of Regents*, 853 F.2d 1351, 1355-56 (6th Cir. 1988)), the filing of an affidavit does not, in fact, command automatic disqualification of a judge. Rather, the judge against whom the motion is directed may properly deny the motion (1) if it was not asserted at the earliest moment after the movant acquired knowledge of the facts demonstrating the basis of the claim and cannot show good cause for any delay (*United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993)); (2) if it was not accompanied by the statutorily required affidavit (see *United States v. Berger*, 375 F.3d 1223 (11th Cir. 2004); *United States v. Branch*, 850 F.2d 1080, 1083 (5th Cir. 1988)); or (3) if the affidavit is not legally sufficient (*Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1387-88 (9th Cir. 1988)). The federal courts have further held that to be legally sufficient, the affidavit must allege facts which, if taken as true, would convince a reasonable person that the judge is biased. *United States v. Thompson*, 483 F.2d 527, 528 (3d Cir. 1973). The facts must be stated with particularity as to time, place, persons, and circumstances. Mere rumors or conclusions will not suffice. *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir.

1987). Moreover, as in Illinois, the bias must be personal rather than judicial and must stem from an extrajudicial source, that is, from some source other than what the judge learned in the course of his participation in the proceedings before him. *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985), citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 16 L. Ed. 2d 778, 793, 86 S. Ct. 1698, 1710 (1966). The favorable or unfavorable disposition a judge has demonstrated toward a party based on facts presented in the current proceeding will not rise to the level of bias or prejudice necessary to trigger the statute except in extreme situations where the judge has displayed a clear inability to render a fair judgment. See *Liteky v. United States*, 510 U.S. 540, 551, 127 L. Ed. 2d 474, 488, 114 S. Ct. 1147, 1155 (1994).

This standard is rarely met, for the hurdle litigants must meet in order to obtain relief under 28 U.S.C. §144 is, if anything, more rigorous than that required by the courts of this State under the law of Illinois. In contrast to the liberal construction principles governing petitions for substitution under sections 2–1001(a)(3) of the Code of Civil Procedure and section 114–5(d) of the Code of Criminal Procedure of 1963, 28 U.S.C. §144 is to be strictly construed against the party seeking to have the case heard by a different judge. See *United States v. Balistrieri*, 779 F.2d at 1199. The original judge has a duty to review the request for substitution to assess whether it is sufficient. Where the request is not sufficient, it is the judge's duty to deny the request and continue to preside over the case. *Sine v. Local No. 992 International Brotherhood of Teamsters*, 882 F.2d 913, 914 (4th Cir. 1989); *Simmons v. United States*, 302 F.2d 71, 75 (3d Cir. 1962).

Consistent with Illinois precedent involving motions for substitution in criminal proceedings and with the approach taken by the federal courts, other decisions by our appellate court have uniformly recognized that a petition for substitution of judge under section 2–1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2–1001(a)(3) (West 2006)) may be denied by the trial judge without referring it to another judge for a hearing on the merits of whether cause for substitution exists if, as in this case, the petition fails to meet threshold requirements. See *Williams v. Estate of Cole*, 393 Ill. App. 3d 771, 776 (2009); *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 248

(2006); *City of Quincy v. Weinberg*, 363 Ill. App. 3d 654, 662 (2006); *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d 644, 649 (1997). Before the appellate court majority issued its opinion here, no judicial authority in Illinois had taken a contrary view. For the reasons we have explained, the appellate court majority's position is untenable. We therefore agree with the conclusion of the dissenting appellate court justice that the circuit court did not err when it denied Bailey's motion for substitution.

In reaching this conclusion, we are not unmindful of the potential conflict posed by permitting the judge whose partiality is being questioned from making the initial determination as to whether a motion for substitution is sufficient to trigger the requirement that it be referred to another judge for consideration on the merits. We believe, however, that this concern is more theoretical than real. In many, if not most, cases, evaluation of the threshold requirements will turn on objective considerations: when was the basis for the claim of cause discovered, when was the petition filed, was the petition verified by affidavit, does the "cause" alleged in the petition stem from some extrajudicial source? Depending on the circumstances, inquiry into whether the petition was filed in good faith rather than for purposes of delay or whether its allegations, if true, would be sufficient to establish "cause" for substitution within the meaning of section 2–1001(a)(3) may require a more complex and nuanced analysis. We are confident, however, judges will undertake their review of substitution petitions conscientiously and in accordance with the law. Judges are assumed to be impartial, after all (see *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 263 (2004)), and they have a powerful incentive to err on the side of caution. If they deny a petition for substitution under circumstances where the appellate court subsequently determines that the petition should have been allowed, all of their subsequent rulings in the case will be invalidated. See *Curtis v. Lofy*, 394 Ill. App. 3d 170, 176 (2009) (orders entered after motion for substitution has been improperly denied are void).[14]

---

[14]The appellate court in this case took the view that the trial judge's initial refusal to refer the petition to another judge for a hearing on the merits was a triggering event which rendered everything that followed void. 389 Ill. App. 3d at 786. An argument could be made, however, that the erroneous denial

The determination that the trial court did not err in denying Bailey's petition for substitution does not end this appeal, for Bailey raised additional challenges to the circuit court's judgment which the appellate court did not reach. The briefs filed by the parties in the appellate court regarding the additional issues have been included in the record before us and we are fully conversant with both the applicable law and the relevant facts. Under these circumstances, and considering Mrs. Wilson's advanced age, her declining health and the considerable period of time this matter has already been pending in court, we believe that it would best serve the interests of justice and judicial economy for us to proceed directly to the remaining issues without further remand.

In all, Bailey has raised three arguments in addition to her claim that the trial court erred in denying her motion for substitution. The first is that the circuit should have granted her motion to dismiss Williams' emergency motion to revoke her powers of attorney and for an accounting. In support of this argument, Bailey asserts, *inter alia*, that the guardian *ad litem* "substantially interfered with the trial court proceedings"; that the trial court denied Bailey, the Services, and Wilson "even the most basic opportunity to be heard"; that the trial court assumed an "inappropriate dismissive and condescending attitude" to Bailey's original lawyer; and that the trial court rushed to judgment in disregard of various procedural requirements, resulting in "tragic" consequences for Mrs. Wilson, Mr. Service and Bailey. These conclusory accusations are wholly unsupported by the record or pertinent legal authority. In view of what actually transpired in the trial

---

of a motion for substitution should render subsequent orders voidable rather than void. There is support for this view. See *Musolino v. Checker Taxi Co.*, 110 Ill. App. 2d 42, 46-47 (1969). An argument could also be made that the triggering event for voidness (or voidability) should not be the trial court's initial decision to deny a petition to substitute, but rather the ultimate determination that cause for substitution existed and that the case should, in fact, have been heard by a different judge. After all, if it turns out that there was, in fact, no cause for substitution (and, by extension, that no basis existed for removing the original trial judge from the case), the rationale for invalidating the initial trial judge's order is eliminated. Because resolution of these arguments is not necessary to the disposition of the case before us, we express no view on them here.

court, the details of which were set out at length earlier in this opinion, and considering the gravity of Bailey's own misconduct, we will only remark that Bailey's attempt to place any responsibility on the guardian *ad litem* or the court for what happened to her, to Mr. Service or to Mrs. Wilson is stunning in its audacity.

Bailey's final two arguments are that the circuit court's judgment revoking Bailey's powers of attorney was against the manifest weight of the evidence, and that the dollar amount of the judgment entered by the circuit court was not supported by the record. These claims are also completely without merit. A trial court's finding is not against the manifest weight of the evidence unless an opposite conclusion is clearly evident. If the record contains any evidence to support the trial court's judgment, the judgment should be affirmed. *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488 (2004).

Our review of the record leaves no question that there was ample evidence to support the circuit court's judgment in this case, including its determination regarding the dollar amount Bailey is obligated to repay. To reject the circuit court's judgment, as Bailey urges us to do, would require this court to reweigh the evidence and make its own, independent assessment of the various witnesses' credibility. This we may not do. See, *e.g.*, *In re Rodney T.*, 352 Ill. App. 3d 496, 503 (2004); *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992).

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed. The judgment of the circuit court is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

CHIEF JUSTICE FITZGERALD took no part in the consideration or decision of this case.

-40-

JUSTICE FREEMAN, specially concurring:

I agree that the judgment of the circuit court must be affirmed, but I do so for reasons other than those expressed in court's opinion. As I explain below, the appellate court correctly held that the trial court erred in not automatically referring the petition for substitution for cause (735 ILCS 5/2–1001(a)(3) (West 2006)) to another judge. The error, however, is harmless and reversal is not required. It is for that reason that I concur in the court's judgment.

This case concerns nothing more than a routine question of statutory interpretation. As such, the best place to begin is with the language of the statute. Section 2–1001(a)(3) provides:

> "A substitution of judge in any civil action may be had in the following situations:
>
> * * *
>
> (3) Substitution for cause. When causes exists.
>
> (i) Each party shall be entitled to a substitution or substitutions of judge for cause.
>
> (ii) Every application for substitution of judge for cause shall be made by petition, setting forth the specific cause for substitution and praying a substitution of judge. The petition shall be verified by the affidavit of the applicant.
>
> (iii) Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition. The judge named in the petition need not testify but may submit an affidavit if the judge wishes. If the petition is allowed, the case shall be assigned to a judge not named in the petition. If the petition is denied, the case shall be assigned back to the judge named in the petition." 735 ILCS 5/2–1001 (West 2006).

The plain language of section 2–1001(a)(3) does not authorize an Illinois judge accused of bias or prejudice in a civil proceeding to control the disposition of the petition seeking substitution of judge for cause. The statute sets forth only what the petition must contain: the specific cause for substitution must be identified and the petition must be verified by an affidavit. The statute provides, upon the filing of a

petition, for a "hearing" to be conducted "as soon as possible" by another judge. Subsection (iii) does not speak in terms of the filing of a "sufficient" or an "adequate" petition. Notably, the statute does not speak in terms of "threshold requirement[s]" (slip op. at 27, 31, 37, 38) needed to "trigger" (slip op. at 27, 38) the hearing. Nor does the statute refer to "threshold deficiencies" that prevent another judge from hearing the matter. Slip op. at 31. And the statute certainly does not expressly set forth the bifurcated process that the court embraces today. See slip op. at 35 (referring to the establishment of a "threshold procedural" stage and "substantive" stage). In construing a statute, this court is not free to depart from the plain language of the statute by reading into it exceptions, limitations or conditions that are not there. *Town & Country Utilities*, 225 Ill. 2d at 117.

Rather than address the statutory language at issue, the court instead begins its analysis by stating that Illinois courts have long recognized that a party's right to have a second judge adjudicate the motion is "not automatic" despite the fact that this court has never addressed the precise question presented today. The appellate court cases cited by the court are *People v. Damnitz*, 269 Ill. App. 3d 51 (1994), *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d 644 (1997), *City of Quincy v. Weinberg*, 363 Ill. App. 3d 654 (2006), *In re Estate of Hoellen*, 367 Ill. App. 3d 240 (2006), and *Williams v. Estate of Cole*, 393 Ill. App. 3d 771 (2009). Slip op. at 37-38. *Quincy* does not address the specific question raised in this case so I do not believe it is helpful in addressing the parties' contentions. Both *Williams* and *Hoellen* rely on *Alcantar*, which in turn relies on *Damnitz*. Notably, none of these cases interpret the actual language of section 2–1001(a)(3). For this reason alone, these cases are unpersuasive since the primary principle of statutory construction is to ascertain and give effect to the intent of the legislature and the language of the statute itself is considered the most reliable indicator of the legislature's intent. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007).

Cases like *Alcantar* and *Damnitz* hold generally that, because some source of extrajudicial source must trigger a claim of bias, it is therefore proper for the challenged judge to initially screen section 2–1001(a)(3) petitions for sufficiency. As mentioned earlier, *Alcantar* merely cited to *Damnitz* in support of this holding. *Damnitz* found

support for its conclusion that the challenged judge could make an initial determination on the sufficiency of the allegations because judicial rulings alone almost never constitute a valid basis for a bias or partiality motion, citing a United States Supreme Court case, *Liteky v. United States*, 510 U.S. 540, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994). Although the Supreme Court did say that such claims ordinarily would not support such claims, it allowed that they *might.* Accordingly, this court has stated the rule from *Liteky* in the following manner:

> " '[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' (Emphases in original.)" *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002), quoting *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 491, 114 S. Ct. 1147, 1157 (1994).[15]

As noted, the court in *Damnitz* based its holding that a threshold inquiry by the challenged judge is warranted on the fact that *ordinarily* most bias charges stemming from conduct during trial will not support a finding of actual prejudice. But given Liteky's acknowledgment that there can be instances of where a successful bias motion stems from a

---

[15]Indeed, the language from *Liteky* establishing this point is quoted in the court's opinion today: "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to *** *may* [support a bias or partiality challenge] if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " (Emphases in original.) Slip op. at 28, quoting *Liteky*, 510 U.S. at 555, 127 L. Ed. 2d at 474, 114 S. Ct. at 1157.

non-extrajudicial source (*i.e.*, judicial conduct from current or prior proceedings), a challenged judge should not be allowed to make an initial screening determination regarding a for-cause motion's sufficiency. Simply stated, if some allegations of bias stemming from judicial rulings may be successful, then the challenged judge should not be in the position to decide whether the petition may be "advanced" to a second judge.

In light of the above, the appellate court's holding, that an Illinois judge accused of bias or prejudice cannot control the disposition of a petition seeking change of judge for cause, is faithful to the language of section 2–1001(a)(3). However, practical reasons also support this holding. Under the court's "threshold" inquiry procedure, the following situation becomes a possibility: A motion for substitution for cause is filed. The challenged judge screens it in the "threshold" stage and rules that the petition does not contain allegations that are "sufficient" enough to "trigger" a hearing. The movant returns with another motion that she believes is "more sufficient." The challenged judge again rules that the petition lacks the needed sufficiency to "trigger" a transfer for a hearing. The possibility therefore exists that a potentially biased judge is able to thwart the case from being reassigned to a second judge to hear the for-cause allegations. This can have an impact on the litigation. The movant may be forced to consider settling so as to avoid going to trial in front of a judge she believes is biased against her. Or, she may take the chance and proceed to trial before that judge. If she ultimately loses the case, she can challenge the substitution for cause ruling on appeal. If she is successful, the litigants will be forced to go through an entire new trial, with all of its attendant costs, including that of appeal. These costs, plus judicial resources, are saved if, at the first instance, a judge who receives a for-cause motion, sends it to another judge for a ruling whether it be a ruling based on lack of verification, insufficient pleadings, or lack of cause.

In contrast, the court today interprets section 2–1001(a)(3) to require three things before the right to a hearing before another judge is "triggered": "the request must be made by petition, the petition must set forth the specific cause for substitution, and the petition must be verified by affidavit." Slip op. at 27. The court then states that Bailey's petition only met one of the requirements–it was in fact a petition–but that it did not meet the other requirements as it was neither verified by

affidavit nor did it "adequately" allege cause for substitution. Slip op. at 27. The statute, however, does not require "adequate" or "sufficient" allegations of cause–the statute requires only that the specific cause for the substitution be alleged. I note that, in this regard, the court specifically states that section 2–1001(a)(3) is analogous to section 144 of the federal code. Slip op. at 35-36. But a comparison of the two statutes reveals that they are not the same. Section 144 requires a "timely and sufficient affidavit" be filed by the party asserting the challenge before the matter is assigned to another judge to "hear" the proceeding. Section 2–1001(a)(3) does not contain either a timeliness or a sufficiency component to it.

Further, relying on *Alcantar*, the court states:

> "[E]ven if we took Bailey's allegations as true, they would not suffice to establish 'cause' for substitution within the meaning of the [statute]." Slip op. at 28.

Thus, according to the opinion, a challenged judge is allowed to make an initial determination of whether "cause" has been alleged and is under no obligation to refer the matter to another judge for hearing. The statute however states that "upon" the filing of a petition, a hearing to determine whether "the cause exists shall be conducted." Thus, the language of the statute expressly provides that whether cause exists is to be left to another judge.[16] The court then proceeds to hold that any questioning done by the judge here was done pursuant to her role in guardianship proceedings. The court states:

> "While it is true that the court expressed skepticism regarding Bailey's testimony and the propriety of her conduct, it can scarcely be claimed, given the facts of this case, that the court's

---

[16]I must point out that, in discussing the sufficiency of the allegations contained in the petition, the court states that Bailey argues that the trial judge "disregarded her role as a judge and impermissibly assumed the role of an advocate. This contention is wholly without merit. As a preliminary matter, no such allegation was contained in the petition for substitution itself." Slip op. at 29. This, however, is not entirely accurate. Bailey does assert this in her brief to this court, but the allegation in the motion is that the judge in question "without a hearing placed Karen Bailey under oath and asked questions of an adverse nature." It is clear then, that the motion did contain an allegation that the judge was not acting as a neutral person.

-45-

skepticism was in any way unjustified." Slip op. at 29.

This language is troubling. Does this mean that the challenged judge can, in making her "threshold" determination, look beyond the allegations for reasons to deny the motion? In this case, when the motion was presented to the trial judge, she did not know that facts would later be adduced in evidence and that would later justify this initial finding. It must be pointed out that what prompted the for-cause motion in this case was the judge's *sua sponte* questioning of Bailey during a status hearing set to in order to decide a hearing date on Bailey's motion. During her *sua sponte* questioning of Bailey, the judge asked Bailey's attorney if he understood why she [the judge] "would have some concerns?" When the attorney replied that there were witnesses who could corroborate Bailey's testimony at an evidentiary hearing, the judge stated: "Quite possibly if it were to go to hearing." The question here is, whether given her *sua sponte* questions, the judge could have been impartial at the future hearing. That the evidence later revealed that her skepticism at the status hearing was justified is of no moment to the question of whether section 2–1001(a)(3) required her to send the motion to another judge.

The court's opinion has other problems beyond its expansive statutory construction. The court states that beyond the lack of an affidavit and the failure to allege legally sufficient basis for finding cause, Bailey's request came "too late." As I have already pointed out, the statute does not specify when such a motion is to be filed. Case law holds that it should be filed as soon as possible to the discovery of the alleged bias. But when that occurs can be a question of fact. Again, this would require the challenged judge to rule on a subjective question of whether something was filed "in time." The court also states that in this vein, the challenged judge can look into and inquire into the good faith of the motion. Slip op. at 30. How can good faith be considered a threshold matter and why would a judge accused of bias be the one to make that call?

Apparently aware that its holding contravenes the statute's plain language, the court admits that the appellate court was "entirely" correct that "courts should normally" apply the language of the statute as written. Slip op. at 32. What the appellate court overlooked, the court states, is that there is an important exception to this rule–when undertaking the interpretation of a statute, a court must presume that

-46-

the legislature did not intend to produce an absurd or unjust result. Slip op. at 32. The court identifies the "absurd" result as follows:

> "If it were literally true that a hearing on whether there was cause for substitution had to be conducted by another judge [upon filing of the petition], an unscrupulous litigant could effectively bring an immediate halt to any pending civil case, at any time, without regard to when the basis for the petition for substitution was discovered, without regard to whether the petition set forth the specific cause for which substitution was requested, and without regard to whether the petition was accompanied by the affidavit of the applicant or met any other procedural requirements to which civil proceedings are normally subject. The disruption this could create for the conduct of litigation is self-evident." Slip op. at 32-33.

I strongly disagree with this analysis. Initially, a trial judge has Rule 137 sanctions available to punish the "unscrupulous" litigants who file frivolous pleadings. See *Fischer v. Brombolich*, 246 Ill. App. 3d 660, 664 (1993) (recognizing Rule 137 is designed to "penalize litigants who plead frivolous or false matters or bring suit without any basis in law"). Second, "unscrupulous" litigants often use many legitimate tools of litigation to ensure delay in cases. For example, motions for extensions of time, continuances, and stays, are routinely used in Illinois courtrooms daily to as delay tactics. Accordingly, the answer to the court's "disruption" argument is that trial judges should sanction such behavior, not that this court rewrite a statute which is to be given a liberal construction to "promote rather than defeat the right of substitution." *People v. Jones*, 197 Ill. 2d 346 (2001).

Additionally, and again apparently aware that it is inconsistent to hold that subjective determinations such as timeliness and good faith and sufficiency of allegations are in fact objective, "threshold" matters that the challenged judge can make in the first instance, the court states:

> "In reaching this conclusion, we are not unmindful of the potential conflict posed by permitting the judge whose partiality is being questioned from making the initial determination as to whether a motion for substitution is sufficient to trigger the requirement that it be referred to another judge for consideration on the merits. We believe, however, that this

concern is more theoretical than real. In many, if not most, cases, evaluation of the threshold requirements will turn on objective considerations: when was the basis for the claim of cause discovered, when was the petition filed, was the petition verified by affidavit, does the 'cause' alleged in the petition stem from some extrajudicial source? Depending of the circumstances, inquiry into whether the petition was filed in good faith rather than for purposes of delay or whether its allegations, if true, would be sufficient to establish 'cause' for substitution within the meaning [of the statute] ***may require a more complex and nuanced analysis***. We are confident, however, judges will undertake their review of substitution petitions conscientiously and in accordance with the law. Judges are assumed to be impartial, after all [citation], and they have a powerful incentive to err on the side of caution. If they deny a petition for substitution under circumstances where the appellate court subsequently determines that the petition should have been allowed, all of their subsequent rulings in the case will be invalidated." (Emphasis added.) Slip op. at 38.

First, only one of the "objective considerations" listed above is truly objective: Is there a verification? Every other one is subjective. Even whether a purported affidavit meets the affidavit requirements of Supreme Court Rule 191 and is, in fact, an "affidavit" can be difficult to determine. See *Robidoux v. Oliphant*, 201 Ill. 2d 324 (2002). Indeed, it was asked at oral argument if a certification under section 1–109 of the Code of Civil Procedure could in some circumstances satisfy the affidavit requirement. These types of questions indicate that having a second judge handle a for-cause petition's entire litigation is more efficient than the nebulous two-step inquiry that the court today embraces. Indeed, I see no reason why "complex and nuanced" questions are to be resolved by the judge whose impartiality is in question. This holding virtually guarantees litigation on appeal on these questions, as this case demonstrates. Would it not be a better practice for this court to set a policy that works to *reduce* appealable questions by having these petitions go to another judge whose impartiality is not in question as a matter of course? I note in this area that again, Illinois practice differs from the federal practice alluded to in today's opinion–in most federal jurisdictions, an appeal may be taken

immediately from the challenged judge's finding of insufficiency of the allegations under section 144. See *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 117 (7th Cir. 1997) (explaining appellate review of section 144 motions). In Illinois, in contrast, an appeal from the denial of the motion for substitution (no matter which judge rules) comes with the case when it is finally disposed of.

A final thought on the language I have quoted above. I agree with the court in that I have the utmost confidence in our trial judges. But, even the most conscientious judges can make mistakes in cases in which his or her impartiality is *not* in question. Thus, I would avoid putting a challenged judge in such a situation by holding that a for-cause petition should be reviewed by a second judge once it has been filed. I note too that many judges in the circuit court already utilize this practice in order to avoid any questions of impropriety or overreaching on their part.

Today's decision discourages conscientiousness and rewards expediency. In the wake of the United States Supreme Court's decision in *Caperton v. A.T. Massey Coal Co.*, __ U.S. __, 173 L. Ed. 2d 1208, 129 S. Ct. 2252 (2009), questions regarding whether section 2–1001(a)(3) comports with due process have already been raised. Indeed, that question and the related question of what constitutes "cause" under the statute are currently before this court in *In re Marriage of O'Brien*, No. 109039, which was argued in January 2010. In *O'Brien*, the issue is whether actual bias is the only type of "cause" sufficient to warrant transfer to another judge or if cause also encompasses the appearance of impropriety standard contained in Canon 3(C)(1) of the Code of Judicial Conduct. The court's decision today indicates that actual bias is the standard to be used and apparently answers at least one of the questions at issue in *O'Brien*.

Although I agree with the appellate court that the trial judge committed error by not having sent the matter to a second judge, I cannot agree with appellate court's conclusion that a new trial is warranted. According to the appellate court, whether a for-cause petition sets out detailed facts, whether the petition is supported by a sworn statement containing facts personally known to the declarant and the declarant's signature, whether the allegations are true, and whether the allegations amount to demonstrated judicial prejudice or bias; are all questions that are properly addressed by a judge whose impartiality

is not in dispute. While I generally agree with this statement, the problem for Bailey here is that her petition contained no sworn statement or affidavit purporting to contain facts personally known to the declarant, as is required under section 2–1001(a)(3) for the impartial second judge to review. A for-cause motion may be denied strictly on the basis of the lack of an affidavit notwithstanding the charges of bias contained within the body of the petition. *M. Loeb Corp. v. Brychek*, 98 Ill. App. 3d 1122, 1128-29 (1981). In light of this fact, the trial judge's error in not having the motion heard by a second judge can be considered harmless since the second judge would have been duty-bound to dismiss the petition for lack of an affidavit. It is on this basis, and not the rationale offered in the court's opinion, that I would hold that reversal on this issue is not warranted.

JUSTICE BURKE joins in this special concurrence.