NOTICE
Decision filed 09/23/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250244-U

NOS. 5-25-0244, 5-25-0245 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MASON B. and NADIA K., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 21-JA-276, 21-JA-277 |
| | ) | |
| Jennifer A., | ) | Honorable, |
| | ) | Janet Rae Heflin, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court did not err in terminating respondent's parental rights, denying her successive motion for substitution of judge, and granting an order of protection against her. As any arguments to the contrary lack merit, we grant the respondent's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent Jennifer A. appeals from three orders of the trial court, which terminated her parental rights over two minor children, denied her motion for substitution of judge, and granted an order of protection against her.[1] Respondent's appointed attorney on appeal concluded this

---

[1]This case is accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), with a disposition date of August 22, 2025. The *pro se* respondent was granted leave to file an amended brief after the dispositional due date. Accordingly, we find that good cause exists for filing the decision after August 22, 2025.

1

appeal lacks substantial merit and filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), along with a memorandum of law in support of that motion.

¶ 3 Respondent filed an initial response to the *Anders* motion on August 21, 2025. Respondent filed an amended response on September 15, 2025.[2] This court has examined the August 21, 2025, response, the September 15, 2025, response, counsel's *Anders* motion and the accompanying memorandum of law, and the record on appeal, and concludes this appeal lacks merit. Accordingly, respondent's appointed attorney is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 4                                    I. BACKGROUND

¶ 5 This matter arises from two cases initiated by the State against respondent regarding two minor children. The State filed juvenile petitions for both children, alleging that they were neglected as defined in the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)).[3] The trial court entered a temporary custody order in both cases on October 5, 2021, finding that probable cause existed for removing the minors from their parents based on the State's allegations. Both children were placed with the foster families mentioned in this appeal in October 2022. The foster father of respondent's son filed a petition for order of protection against respondent, and the trial court entered an emergency order of protection on August 9, 2023, which was later extended twice.[4]

---

[2]Respondent filed a motion for leave to file an amended brief *instanter*; said motion is granted. Respondent also filed a motion for leave to supplement the record and exhibits on September 17, 2025; this motion is denied as the proposed supplement is comprised of documents and exhibits that were not part of the record below.

[3]The petitions named respondent and the children's respective biological fathers; however, we will only discuss respondent, as the fathers are not parties to this appeal.

[4]The foster mother of respondent's daughter also filed a petition for order of protection; however, it is not at issue in this appeal.

¶ 6    The State filed petitions to terminate parental rights in both minors' cases in September 2023, alleging that respondent was an unfit parent pursuant to the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). Respondent, through counsel, filed a motion for substitution of judge on November 2, 2023. Respondent's counsel also moved to withdraw on the same date. The trial court granted both motions, a new judge was assigned to the case, and respondent proceeded *pro se*. Respondent had also filed motions for change of venue and to change the Department of Children and Family Services (DCFS) office assigned to her case; however, she failed to appear at the hearing date on those motions, and they were denied.

¶ 7    The trial court held hearings on the State's petitions to terminate parental rights. The court entered an order finding respondent unfit to parent on March 4, 2024, finding that she had made reasonable efforts, but not reasonable progress, towards correcting the conditions that led to the minors' removal. The court held the best-interest portion of the termination hearing on July 18, 2024, and took the matter under advisement. On November 7, 2024, respondent filed another motion for substitution of judge. Following a hearing, the trial court denied her motion, finding that she had failed to meet her burden of showing prejudice or bias.[5] On May 17, 2025, the trial court entered an order terminating respondent's parental rights over both minors. Respondent filed a timely notice of appeal.

¶ 8                                    II. ANALYSIS

¶ 9    Appointed counsel argues that the termination of respondent's parental rights, denial of her motion for substitution of judge, and entry of an order of protection against her were proper, and

---

[5]Respondent had also filed a motion for substitution of judge against the current judge assigned to the case on May 13, 2024. This motion was similarly denied. However, it is not at issue on appeal.

3

there are no meritorious arguments to the contrary. In the memorandum supporting her *Anders* motion, counsel states that she considered raising the following issues on appeal:

(1) Whether the trial court's finding that respondent was unfit to parent was against the manifest weight of the evidence;

(2) Whether the trial court erred in finding that termination of respondent's parental rights was in the best interest of the minor;

(3) Whether the trial court erred in denying respondent's motion for substitution of judge; and

(4) Whether the trial court erred in granting an order of protection against respondent.

Counsel has determined that these issues would be without arguable merit, and the trial court's judgment was therefore proper.

¶ 10                                    A. "Unfit Person" Finding

¶ 11    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P*., 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2022).

¶ 12    As applicable to the underlying case, the Adoption Act defines an "unfit person," in relevant part, as:

4

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:

* * *

(m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(i), (ii) (West 2022).

¶ 13    Under the Adoption Act, a "reasonable effort" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *Id.*

¶ 14    "Reasonable progress," by contrast, is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. Measuring reasonable progress under section 1(D)(m) of the Adoption Act involves a consideration of "the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)).

¶ 15    In reviewing a trial court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The trial court's finding of unfitness is afforded great deference because the court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not

5

reweigh the evidence or reassess the credibility of the witnesses. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 16  Here, the trial court found that respondent had made reasonable efforts, but had failed to make reasonable progress. We therefore begin with the potential argument that respondent showed by clear and convincing evidence that she had made reasonable progress. As per the testimony of Ciera Smith, a DCFS caseworker who was assigned to respondent's case for approximately three years, respondent's service plan consisted of the following tasks: mental health treatment, substance abuse treatment, parenting education classes, and maintaining a safe and stable home environment.

¶ 17  Smith told the court that respondent was "somewhat" cooperative with DCFS, but not consistently. Initially, she was not cooperative with substance abuse treatment, although she eventually sought treatment services. However, she was told by the treatment provider that she did not need services and was not recommended any treatment. Smith explained that she did not believe that the facility was aware of respondent's previous positive drug tests, as it relied "heavily on self-reporting from parents."

¶ 18  She further testified that respondent's failure to acknowledge her substance abuse issue was a barrier to treatment, and that respondent had been referred for drug testing 10 times and tested positive for methamphetamine on 7 of those tests. The minor children also tested positive for drugs on two occasions, approximately seven months apart, following unsupervised visits with respondent. The first of these instances occurred alongside an incident in which a friend of the respondent accidentally cut off one of the children's fingers.

6

¶ 19 Respondent was similarly inconsistent in her compliance with mental health treatment. Although she had completed a mental health evaluation in December 2023, she had not followed through with obtaining treatment. Smith testified that DCFS referred respondent to several mental health and substance abuse treatment providers, but she always chose to find her own providers, and would repeatedly change providers when "when one [didn't] suit [her] needs." Additionally, the aforementioned drug testing revealed that she did not consistently take the psychotropic medication prescribed to her.

¶ 20 Regarding parenting classes, respondent did successfully complete the recommended classes in the summer of 2022, but she was recommended for additional classes following the children's second positive drug test in February 2023. She engaged in a course that did not meet DCFS's standards for parenting courses and was therefore referred again in November 2023. The caseworker testified that she did not receive any notice that respondent had completed these classes. Respondent testified that she was currently enrolled. However, the caseworker stated that respondent was not rated as satisfactory on the parenting portion of her service plan.

¶ 21 Respondent testified that she was a recovering drug addict and alcoholic, but was trying her best to get help and get her children back. She averred that she was "very adamant about going to AA" and completed both a mental health assessment and substance abuse classes. She acknowledged that she had not completed the third recommended parenting course, but said she was attending classes and only had two left. She further testified that she repeatedly tried to contact DCFS for information on what she was supposed to do but never received a response. She denied being noncompliant with her service plan.

¶ 22 The State acknowledged that in the time prior to the filing of the petition in September 2023, respondent had a history of "doing things well and doing things not well." However, it

argued that she had never made progress to the point that the minors were returned to her home. The two occasions upon which her parenting time was increased were the times that the children tested positive for methamphetamine. The State concluded that respondent had not made substantial efforts over a nine-month period, and asked the trial court to find her unfit to parent.

¶ 23    A consideration of respondent's progress towards reunification, as measured objectively by her compliance with her service plan, shows that the trial court's findings were not against the manifest weight of the evidence. It is clear from the record that respondent failed to substantially comply with any of the tasks required to correct the conditions that led to the minors' removal. The unrefuted evidence provided by DCFS clearly and convincingly demonstrated respondent's unfitness.

¶ 24    Furthermore, the trial court stated that it had taken notice of the orders entered on January 17, 2023, and February 20, 2023, which indicated that respondent was making reasonable efforts and was granted unsupervised visitation. However, the court noted that there had never been an order stating that she was making reasonable progress. The court then rendered its finding of unfitness. Giving deference to the trial court's determination, and without reweighing the evidence, we conclude that there is no meritorious argument that could be made that this finding was unreasonable or arbitrary.

¶ 25                              B. "Best Interest of the Child" Finding

¶ 26    After determining that respondent was unfit to parent, the trial court found that terminating her parental rights was in the best interest of the child. Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must

yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 27   In making a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

See also 705 ILCS 405/1-3(4.05) (West 2022).

¶ 28   As with the trial court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the trial court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 29   At the best-interest portion of the termination hearing, the trial court took judicial notice of DCFS caseworker Smith's prior testimony and heard additional statements from her. Smith prepared the best-interest report, which the court admitted into evidence. She testified about the current foster placements for the two children. In both placements, the foster parents had passed background checks, signed permanency commitments, and wanted to adopt the children.

¶ 30   Smith described the respective home environments as safe and stable, and described the positive bonds each child had with their new foster siblings and the comfort and care they received from their foster parents. Based on her review of the children's cases, Smith opined that it would

9

be in both children's best interests to terminate respondent's parental rights. Smith also testified that she was aware of the fact that the foster parents filed orders of protection against respondent and further testified that they were filed because of several incidents in which respondent used the foster mother's name to get hospital and school records, sent harassing text messages, and made threats over Facebook.

¶ 31 After the State rested, respondent called her mother to testify. Her mother stated that she did not see why the children were removed from placement with her, and that they should be returned to her home. She also testified that she saw bruises on both children on two occasions in 2023 when visiting the DCFS office, and that one of the children had a bladder infection in February 2024.

¶ 32 Respondent also called Leah Sika, the DCFS supervisor assigned to respondent's case. Respondent asked Sika whether her being on the board of directors for a fostering nonprofit along with a foster parent of one of the children was a conflict of interest. Sika testified that she was contacted by and responded to DCFS's ethical officer and conflict-of-interest committee regarding respondent's case, and had not received a formal disposition from their findings. She also stated that she was no longer on the board as of December 2023, and that she knew the parent because he was a longtime licensed foster parent with DCFS. Sika also testified that she was informed of bruises on one of the children, and that she was told they came from roughhousing at his foster home and were not deemed abuse. Sika believed that the children were both happy in their placements.

¶ 33 On cross-examination, she explained that she had the opportunity to observe the minors in their placements. She believed both foster families were able to maintain the minors' background ties to their religion, foster community ties with the minors, and develop their sense of identity.

10

She further stated that the minors had not expressed any fears in their respective homes, and that moving the minors from these homes would be detrimental to them because they had been with these families for two years and had developed a sense of safety, stability, and security with them. Sika opined that, given the history of the case and the harm the minors had endured, the foster parents were better positioned to parent the minors than respondent.

¶ 34    Respondent also made a statement, alleging that her civil rights had been violated and she was denied her right to religion because she was an atheist and objected to the foster parents taking her children to church. She stated that while she knew she had made mistakes, she loved her children and should not have had them taken away, and that her children wanted to come home to her. She argued that she no longer did drugs and had made "huge improvements and changes" in her life. She also challenged the validity of the medical records showing that her son had tested positive for drugs and alleged that a previous foster parent had neglected her daughter for a month and a half when she had an infection caused by poor hygiene.

¶ 35    In its March 17, 2025, termination orders, the trial court found that both children had been in their current foster placements since October 2022, both sets of foster parents had signed permanency commitments and wished to adopt the minors, the minors were strongly bonded to their foster families, and their emotional, psychological, and financial needs were met in the respective foster homes. Based on these conclusions, as well as the contents of DCFS's best-interest reports, the court found by a preponderance of the evidence that the termination of respondent's parental rights was in the best interests of the minors.

¶ 36    On appeal, appointed counsel acknowledges that the evidence showed that respondent loves her children and was trying to have them returned to her care. However, this is not the primary concern at this stage of termination proceedings. *In re D.T.*, 212 Ill. 2d at 364. The record

11

shows that the State demonstrated by a preponderance of the evidence that it was in the children's best interest to terminate respondent's parental rights. The testimony and evidence sufficiently supported findings that the statutory factors weighed in favor of termination based on the children's best interests, and the trial court's orders show that the court considered these factors in rendering its decision. We therefore agree with counsel that there is no meritorious argument to be made that the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 37                              C. Motion for Substitution of Judge

¶ 38     Next, appointed counsel considered whether the trial court erred in denying respondent's motion for substitution of judge. Respondent filed her first motion to disqualify or substitute judge on November 2, 2023, alleging bias against her. The court granted this motion on December 12, 2023, and a new judge was assigned to the case.

¶ 39     Section 2-1001(a) of the Code of Civil Procedure (735 ILCS 5/2-1001(a) (West 2022)) provides that each party to a civil action is entitled to a substitution of judge for cause. This section states, in pertinent part, as follows:

> "(ii) Every application for substitution of judge for cause shall be made by petition, setting forth the specific cause for substitution and praying a substitution of judge. The petition shall be verified by the affidavit of the applicant.
>
> (iii) Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition. The judge named in the petition need not testify but may submit an affidavit if the judge wishes. If the petition is allowed, the case shall be assigned to a judge not named in the petition. If the petition is denied, the case shall be assigned back to the judge named in the petition." *Id.* § 2-1001(a)(3)(ii), (iii).

¶ 40     Although the statute does not define "cause," our courts have held that the forced removal of a judge requires actual prejudice, which means a showing of "either prejudicial trial conduct or

12

personal bias." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 30. Judges are presumed to be impartial, and the burden of overcoming that presumption rests on the party seeking substitution. *Id.* ¶ 31. Furthermore, "most bias charges stemming from conduct during trial do not support a finding of actual prejudice." *Id.* Where a party seeks to substitute a judge for bias or prejudice, "it must normally stem from an extrajudicial source, *i.e.*, from a source other than from what the judge learned from her participation in the case before her." *In re Estate of Wilson*, 238 Ill. 2d 519, 554 (2010).

¶ 41    Here, respondent filed her first motion for substitution of judge against the second judge assigned to her case on May 13, 2024. The trial court, under a different judge, heard the motion on May 20, 2024. Respondent argued that the new judge was biased against her because she refused to hear respondent's side regarding the order of protection, and failed to notify respondent of a hearing date for her pending motions, causing them to be denied.

¶ 42    Regarding the first issue, the State explained in response that the court did not actually hear argument on the order of protection, as it was not set for hearing on the date in question. Furthermore, this was under the original judge assigned to the case; the second judge only continued the matter because the order of protection would be affected by the then-pending termination issue. At the time of the hearing on respondent's motion, there had not been a hearing on the order of protection. Secondly, the State argued that even if respondent was correct that she did not receive email notice from the court regarding the hearing date that she missed, she was notified of the date from DCFS, which had provided her with the date on several occasions. Therefore, the court's denial of her motions was through her own choice to not appear.

13

¶ 43 The court then found that respondent had failed to meet her burden of demonstrating bias and merely asserting that the court's email notice was not sent to her was insufficient to meet that "very high bar." The court therefore denied her motion.

¶ 44 Respondent filed a successive motion for substitution of judge, which the trial court heard on December 12, 2024. Prior to the hearing, respondent had the opportunity to have an attorney appointed to represent her; however, she chose to proceed with the hearing *pro se*. Respondent alleged that the current judge had a conflict of interest because she was "best friends" with the secretary of respondent's former attorney—although she admitted that the judge was not involved in her case during the time that this attorney represented her. Respondent also alleged that the judge was Facebook friends with counsel for DCFS, with the DCFS investigator assigned to her case, and with the DCFS caseworker who testified at the termination hearing. She further claimed that the judge would not allow "the facts to come out" due to her bias against respondent.

¶ 45 The trial court explained that social media activity did not reflect the nature of a real-life relationship, and that it was not uncommon for people who work in the same field to have connections on social media that may or may not extend to everyday life. The court therefore denied this motion as well, finding that respondent had failed to provide sufficient evidence to require the judge's removal for cause.

¶ 46 It is clear from the record that respondent presented no evidence of actual prejudice in either of her challenges to the second judge assigned to her case, and failed to meet her burden of overcoming the presumption that the judge was impartial. In her first attempt, her allegation that the judge did not allow her to be heard was based on her own mistake or misunderstanding. Her remaining argument was that she did not receive the email notifying her of a hearing date. Even if this were true, it is clear that this would not support a meritorious claim of prejudice or bias. At

14

the second hearing, respondent made vague, unsupported claims of the judge not allowing "the facts to come out," and alleged that she was Facebook friends with certain individuals at DCFS who were involved in respondent's case. As the trial court found, respondent did not show that the judge had any actual relationship with these individuals beyond a connection on social media. Furthermore, respondent did not demonstrate any prejudicial conduct in the proceedings or any personal bias that arose from these alleged relationships. Therefore, we find that there is no valid basis upon which to challenge the trial court's denial of respondent's motion to substitute judge.

¶ 47                                    D. Order of Protection

¶ 48    Lastly, appointed counsel considered whether respondent could argue that the trial court erred in granting the petition for an order of protection filed by the foster father of respondent's son against respondent. The trial court entered an emergency order of protection on August 9, 2023, which was extended twice and covered both foster parents and their minor children. The court entered a plenary order of protection, adding respondent's son to the list of protected individuals, on November 8, 2024.

¶ 49    Section 2-25 of the Juvenile Court Act allows the court to issue an order of protection "in assistance of or as a condition of any other order authorized by this Act," based on the health, safety, and best interests of the minor. 705 ILCS 405/2-25(1) (West 2022); see also *In re D.P.*, 2011 IL App (1st) 111631, ¶ 4. Pursuant to this section, the order may require a person to, in pertinent part, do any of the following:

> "(a) to stay away from the home or the minor;
> ***
> (c) to abstain from offensive conduct against the minor, his parent or any person to whom custody of the minor is awarded;
> * * *
> (g) to refrain from acts of commission or omission that tend to make the home not a proper place for the minor;

15

(h) to refrain from contacting the minor and the foster parents in any manner that is not specified in writing in the case plan." 705 ILCS 405/2-25(1)(a), (c), (g), (h) (West 2022).

¶ 50    In his petition for an order of protection, the foster father alleged the following: that respondent had been posting defamatory statements and threats towards him and his wife on social media for the past year; that respondent filed a false claim accusing him and his wife of causing bruises to the child and falsifying his medical records to make respondent look like a bad parent; that respondent impersonated his wife in order to obtain confidential information from the child's school, and then reported to the child's truancy officer that the foster parents were abusing him; that respondent surveilled his residence; that respondent had a history of violence, including an arrest for aggravated battery that occurred in the minor's presence; and that he and his wife feared that respondent's harassment and threats would result in both physical harm and harm to their careers and reputations.

¶ 51    At the order of protection hearing, both foster parents testified to the various incidents alleged in the petition. Respondent admitted that she had contacted her son's school, claiming to be his foster mother. The foster father identified an email that respondent had sent to the school, in which she made various accusations against the foster parents and DCFS workers regarding treatment of the child. He noted that the email included his address, which the family had never provided to respondent. He testified that when he learned of the email, he felt unsafe and feared for his family, causing him to install a surveillance system at home before ultimately moving to a new residence.

¶ 52    The trial court took judicial notice of the foster father's December 6, 2023, petition for indirect civil contempt based on communications from respondent on social media. He testified that respondent's posts about him and his wife violated the emergency order of protection in effect

16

at that time, and further alleged that respondent continued to violate its terms by making more threatening and defamatory posts directed at the foster parents. He acknowledged that the social media posts in question did not use his or his wife's names but explained that he believed them to be about his family based on various references and context clues, as well as the other actions respondent had taken against his family, as previously discussed.

¶ 53     The minor's foster mother testified that she was a licensed nurse practitioner, and that she had learned of respondent's attempt to obtain medical records about the child using her name and/or professional credentials. She also testified about feeling attacked and violated by respondent's social media posts; she feared that the anger exhibited in the posts could transition to real life, and respondent could cause physical harm. She stated that respondent's actions continued despite the emergency order of protection in place. On cross-examination, she admitted that she did not know for sure if the posts were made by respondent, but she believed that it was her based on the wording.

¶ 54     Respondent testified about discrepancies in her son's medical records, that she had never gone to the foster parents' residence, and, regarding her social media posts, that "half the things that they've said that they're scared about has nothing to do with them." After hearing the testimony, the trial court found that that the foster parents were credible, and respondent was not. It further found that respondent had engaged in a "course of conduct that was intended to harass *** the foster parents and did cause them distress." The court explained that the Juvenile Court Act allowed for the entry of an order of protection when it is in the best interest or welfare of the child, and the court found this to be the case here. It therefore extended the order of protection for two years, based on a finding that this was in the child's best interest.

¶ 55 As we previously discussed regarding the trial court's superior positioning to assess the credibility of witnesses and assign the appropriate weight to their testimony, we do not substitute the trial court's findings with our own. Furthermore, it is clear from the record that the trial court did not abuse its discretion in making these findings. Respondent did not present credible evidence contradicting the testimony and evidence offered by the petitioner. She even admitted to impersonating her son's foster mother as per the allegations in the petition. She failed to counter the allegations that her social media posts were directed at the foster parents. We agree with appointed counsel on appeal that there is no meritorious argument to be made that the trial court erred in granting the plenary order of protection.

¶ 56                                III. CONCLUSION

¶ 57 As this appeal presents no issue of arguable merit, we grant appointed counsel leave to withdraw and affirm the circuit court's judgment.

¶ 58 Motion granted; judgment affirmed.